# JANUARY TERM, 1858, AT LANSING.

## The People vs. William Potter.

On the trial of an indictment for murder, where it appeared that the prisoner and the deceased came together at an early hour in the evening, and remained together until the fatal act was committed, near midnight, visiting in the mean time a theater, and drinking together at public houses; — *Held*, That every occurrence, every remark, and the whole conduct of the prisoner, from the time he and the deceased came together until the consummation of the crime, were competent evidence, as part of the *res gestæ*, to enable the jury to determine whether any crime was committed, as well as to inform them of its degree.

Facts which constitute murder at the common law, do not necessarily make the act murder of the first degree under the statute.* The statute does not change the common law definition of murder, but divides it into degrees; and, where it is sought to have the jury convict of murder of the first degree, the burden of proof is upon the prosecution to show such facts, in addition to the act of killing, as make such act murder of the first degree.

*Heard January 6th. Decided January 11th.*

On exceptions from Wayne Circuit.

The prisoner was indicted for the murder of Michael Walsh, and convicted of murder of the first degree.

It was proved, on the trial, that Walsh and the prisoner had been working together for some time before the 25th of October, 1857, and were on friendly terms; that, on the evening of October 24th, the prisoner and Walsh went to the theater in Detroit, and left about ten o'clock, in company with

---

*The provisions of the statute on the subject are: "All murder which shall be perpetrated by means of poison, or lying in wait, or any other kind of willful, deliberate, and premeditated killing, or which shall be committed in the perpetration, or attempt to perpetrate, any arson, rape, robbery, or burglary, shall be deemed murder of the first degree." — "All other kinds of murder shall be deemed murder of the second degree."—*R. S.* 1846, *Chap.* 153, *Secs.* 1 *and* 2; *Secs.* 5711 *and* 5712 *Comp. L.*

two or three other persons; that they had been drinking some in the course of the evening, and immediately after leaving the theater drank together three times, each treating the other in turn, and were soon badly intoxicated; and that, in company with others, they went up Third-street to a public house. The prosecution then offered to show, by persons who accompanied them from the theater to the public house, that when the prisoner was passing along Third-street he said he had been reading "Jack Rand," and he should not be surprised if he should turn highwayman sometime, for he had struggled with poverty long enough; and that, at the time he said this, he had an open dirk-knife in his hand, and said if any man piled on to him, he would stick him. To the introduction of which evidence the counsel for the prisoner objected that it did not tend to show that the prisoner committed the offense for which he was then being tried, but only a general disposition to commit crime. The Court overruled the objection, and permitted the evidence to be given; and defendant's counsel excepted.

It appeared from the evidence, that, immediately after this statement, the prisoner handed his knife to one of the witnesses, who shut it, and handed it back to the prisoner, and prisoner then put it in his pocket; that, up to this time, there had been no difficulty or unkind words between prisoner and the deceased; that the prisoner did not threaten Walsh, or any one else, when he flourished his knife; that, after arriving at the public house, Walsh treated, the prisoner drinking with him; that Walsh and the prisoner left the public house about a quarter before twelve that night, alone, up to which time there had been no difficulty between them, and they seemed to be fast friends; that the prisoner returned to the public house about one o'clock, and stayed all night; and that Walsh was found next morning, a short distance from said public house, badly cut, and died soon after. It was proved by the government that the prisoner said the next day he had killed Walsh; that Walsh seized him, twitched him around,

threw him down, and got him by the throat, and that he thought one or the other must die, and when Walsh had him down, holding him by the throat, he stabbed him and killed him in self-defense. The evidence showed Walsh to have been a much larger man than the prisoner. There was no other testimony to show under what circumstances the act was done, and no proof tending to show that the prisoner had any other motive to kill the deceased.

The counsel for the prisoner asked the Court to charge the jury that, to constitute murder of the first degree, under the statute, something more was necessary than was *necessary* to constitute murder at the common law; that, to constitute murder of the first degree, the murder must be preceded or attended by facts and circumstances not necessarily an ingredient of murder at the common law; that, if the government sought to have the jury convict the prisoner of murder of the first degree, the burden of proof was on the government, to show that the murder was committed in the perpetration, or in the attempt to perpetrate, arson, rape, robbery, or burglary, or by poison, or by lying in wait; or to prove such facts in addition to the act of killing as made the killing murder of the first degree. The Court refused so to charge, but did charge the jury that if the act of killing was proved, the presumption of law was that it was done with malice aforethought; that the burden of proving that the killing was not done with malice aforethought rested upon the prisoner; that, unless it appeared by testimony introduced by the prosecution, the prisoner, to overcome the presumption of law, must either introduce sufficient testimony to satisfy the jury that the act of killing was not done with malice aforethought, or he must make a sufficient showing to raise a reasonable doubt in the mind of the jury as to whether the act was done with malice aforethought or not; that it was not necessary that a premeditated design to kill should have existed any particular length of time before the act of killing; that, if the jury believed that Walsh first assaulted the prisoner, twitched him around, threw

him down, and clinched him by the throat, and the prisoner believed, and had good reason to believe, that Walsh was about to take his life, or to do him some great bodily harm, and he struck the fatal blow to save his own life, or to prevent Walsh doing him some great bodily harm, it would be a case of excusable homicide; but the burden of proof was upon the defendant to show that it was done in self-defense.   To which refusal of the Court to charge as requested, and to the charge as given, defendant's counsel excepted.

*Burt & Maynard,* for defendant:

1. The evidence of the statement of defendant, that he had been reading the life of "Jack Rand," &c., was improperly admitted.   It did not tend to prove the issue, but only a general disposition to commit crime.—2 *Russell on Crimes,* 772—781; 1 *Phil. Ev.* 178—181; *Wharton's Cr. Law,* 234, 884–5; *Kinchelow vs. The State,* 5 *Humph.* 9;  10 *Pet. Abr.* 509; *Dyson vs. Mississippi,* 26 *Miss. Rep.* 384; *Cole vs. The Commonwealth,* 5 *Gratt.* 696;  *State vs. Reenon,* 15 *N. H.* 169; *People vs. Thurston,* 2 *Park. Cr. R.* 131.

2. The refusal of the Court to charge the jury as requested, was erroneous.—*Pennsylvania vs. Lewis, Addis.* 282;  *Mitchell vs. The State,* 5 *Yerger,* 340;  *Dale vs. The State,* 10 *Yerger,* 551;  *Dains vs. The State,* 3 *Humph.* 439;  *Commonwealth vs. O'Hara* (cited in 1 *Russ. on Cr.* 482).

*J. M. Howard, Attorney General,* for the People:

[To the point that the Court did not err in its refusal to charge the jury as requested, the following authorities were cited: *State vs. Dowd,* 19 *Conn.* 391;  *Commonwealth vs. Flanagan,* 8 *Watts & Serg.* 415;  *Commonwealth vs. White,* 6 *Binney,* 183;  *Haines vs. The State,* 8 *Humph.* 597;  *Bratton vs. The State,* 10 *Humph.* 103.]

MARTIN Ch. J.:

The admission, by the Court below, of the statement of the prisoner that he had been reading the life of "Jack Rand,"

&c., was not error. It is true that it was not competent for the prosecution, on the trial of a criminal case, to introduce evidence which tends only to prove a general disposition to commit crime, but this evidence could not, we apprehend, have been offered for that purpose. The facts of the case show that this remark was made in the course of a conversation, during an interview which was concluded by the homicide for which the prisoner stands charged with murder, and at which the deceased was present. Had it been made at another time, or under different circumstances, the rule contended for by the prisoner's counsel would apply; but every occurrence, every remark, and the whole conduct of the prisoner, from the time he and the deceased came together until the consummation of the crime, are competent evidence, as part of the *res gestæ*, to enable the jury to determine whether any crime was committed, as well as to inform them as to its degree. The tendency of the evidence to establish or to disprove malice was a question for the jury, under the instruction of the Court, but its admissibility as an occurrence in the interview which commenced at the theater, and continued until the fatal blows were struck by the prisoner, is beyond question. The general rule, and one just to the public and humane to the accused, is this: That upon the trial of an indictment, the whole occurrence immediately preceding the commission of the act charged as criminal, can be given in evidence, for the purpose of illustrating the act itself, by showing the influences which operated to produce the catastrophe, to establish malice, and to justify the act or mitigate the crime.

The request of the counsel for the prisoner, that the Court should charge the jury that to constitute murder in the first degree, under our statute, something more was necessary than would be *necessary* to constitute murder at common law; that to constitute murder in the first degree, the murder must be preceded or attended by facts and circumstances not necessarily an ingredient of murder at common law; and that, if the government sought to have the jury convict the prisoner of

murder in the first degree, the burden of proof was upon the government to show that the murder was committed in the perpetration, or attempt to perpetrate, arson, rape, robbery, or burglary; or by poison, or lying in wait; or to prove such facts, in addition to the act of killing, as made such act murder in the first degree; although somewhat obscurely expressed, was substantially correct.

Murder is where a person of sound memory and discretion unlawfully kills any reasonable creature in being, in the peace of the State, with malice prepense or aforethought, either express or implied. This, the common law definition, is still retained in our statute. It speaks of the offense as one already ascertained and defined, and divides it into degrees, by providing that all murder which shall be perpetrated by means of poison, or lying in wait, or any other kind of willful, deliberate, and premeditated killing, or which shall be committed in the perpetration, or attempt to perpetrate, any arson, rape, robbery, or burglary, shall be deemed murder in the first degree; and that all other kinds of murder shall be deemed murder in the second degree; and requires the jury, in case of a trial, to find, by their verdict, the degree of the crime; and the Court, in case of a confession of guilt, to ascertain the same from evidence. This division of the crime had its origin in Pennsylvania, where death was the penalty for murder, as early as the year 1794, and its object was "to diminish the area of cases to which the penalty of death is applicable." Accordingly, amongst other things recited in the preamble of that law, is the following: "And whereas, the several offenses which are included under the general denomination of murder differ so greatly from each other in the degree of atrociousness that it is unjust to involve them in the same punishment, all murder," &c. Of this Act ours is a substantial copy. Mr. Wharton, in his "American Law of Homicide" (in which, and in his "Criminal Law," this subject is fully discussed, and of which I have made liberal use), in commenting upon this law, says: "The principle upon which rests this statutory distinction, is that of

the *lex talionis*, and took its origin from the admitted harshness of inflicting death for a homicide, when death was not intended." "No objection was taken to the common law distinctions. The general feeling was, that it was proper that they should remain. The question was one of *punishment*, not of *definition*. It was felt that there was a large class of cases falling under the general head of murder, in which a jury ought to be allowed to say whether there was an intent to take life or not, and where no such intent was found, that it was proper that a sentence lighter than death should be inflicted. And it was to meet this class of cases that legislative action was invoked."

Now, at the common law, if a mortal blow was malicious, although not given with intent to kill, or if death ensued from an act accompanying an unlawful collateral act, or under circumstances which showed general malice, such as a reckless disregard of the safety or lives of others, the killing would be murder, and would be punishable in the same manner as though perpetrated with the deliberate design of taking the life of the victim. It was to mitigate the punishment for this class of murders, and to leave it to the discretion of the Court, to a considerable extent, that our statute was passed; while for murder perpetrated willfully, or in the perpetration, or attempt to perpetrate, either of the four felonies mentioned, the punishment is inflexibly fixed by the law. Hence, in defining the first degree of murder, the statute specifies two instances in which willfulness, deliberation, and premeditation are most strongly indicated, viz., the use of poison, and lying in wait; and then provides that *all other* willful, deliberate, and premeditated killing, should also be murder in the same degree. The more atrocious crime is separated from the general class of murder; and, it would seem to follow that to establish murder in the first degree, more proof is necessary than of the single fact of malicious homicide, and that it must be shown that the killing was willful, and with design to take the life of the victim, or in some one of the ways pointed out in the

statute. When the intent is specially made by the statute an ingredient in the crime, or where it is made essential to enable a court or jury to determine its degree, and to fix the character and amount of the punishment with which its commission is to be visited, such intent must be affirmatively shown, and can not be established by those ordinary legal inferences which were sufficient at the common law to establish the general crime, but at which the statute, by dividing the crime into degrees, especially aimed. Sometimes this intent is established by evidence of hostile feelings, of previously uttered threats, of previous attempts to do bodily injury, or of deliberate preparation. In some instances, the proof of the intent is furnished by the manner of killing; as when the murder is shown to have been committed with a *lethal* weapon, in an unequivocal manner. Here, "the enquiring mind can come to no other conclusion than that the death of the victim was intended. Thus, if one man shoot another through the head with a musket or pistol ball, or if he stab him in a vital part with a sword or dagger, if he cleave his skull with an axe, or the like, it is almost impossible for a reflecting and intelligent mind to come to any other conclusion than that the perpetrators of such acts of deadly violence intended to kill."—*Am. Law of Hom.* 473. In such case, the law presumes every person to intend the usual consequences which accompany the use of the means employed in the manner employed, and casts upon the accused, as much as in the case of avowed malice, the burden of showing that the intention in using the weapon was harmless, or not murderous. The mere proof of the murder, then, without other proof deduced from the manner of the killing, or from other evidence tending to establish a design to take the life of the victim, would not establish the higher degree of the crime, but would only authorize a verdict of murder in the second degree.

We think the Court erred, therefore, in refusing to charge as requested, and in omitting to define clearly to the jury the degrees of murder as established by law. The duty of ascer-

taining the degree of the crime is peremptorily imposed upon the jury trying the issue of "not guilty," and it is only upon evidence that such duty can be performed. Every case must, to a great degree, depend upon the particular facts and circumstances surrounding the transaction; and it is only by the aid and advice of the Court, that a jury can give to such their due weight in determining the degree of the crime. In ordinary cases, it is the duty of a Court to inform the jury of the law by which their verdict must be controlled, and assist them, by such illustrations as the case requires, to apply the law to the facts. In the case of murder where a living death hangs upon the verdict, this duty should be most fully and carefully performed.

The charge of the Court, we think, had a tendency to mislead the jury. The proposition submitted to them, and which was to be their guide in ascertaining the degree of the crime, was, whether there was proof of malice aforethought, or not. Now, it is true, as charged, that if the act of killing was proved, the presumption of law is that it was done with malice aforethought; but this rule only obtains where there is an entire absence of qualifying or explanatory evidence involved in, or deducible from, the manner of the killing. But, malice aforethought is as much an essential ingredient of murder in the second degree, as in that of the first. Without this, the killing would be only manslaughter, if criminal at all. Now, malice aforethought is either express or implied, and there can be no case of murder in the first degree, except when committed in the perpetration, or attempt to perpetrate, arson, rape, robbery, burglary, or robbery, when there does not exist *express* malice; while, in case of murder in the second degree, the malice is generally, if not universally, *implied*.

The rule of the common law in respect to malice is in no degree changed: the statute only relates to its application by the jury in determining the degree of guilt. It is also true that the burden of disproving malice is in all cases of murder cast upon the prisoner, unless the case made by the prosecu-

tion shows it to be absent; and this rule now applies with special force to the second degree of murder, if not entirely to it. While, therefore, as a common law proposition, the charge of the Court below was correct, yet it falls far short, in our apprehension, of an illustration of the statute, and tended to mislead the jury in the discharge of their duty.

The other Justices concurred.

*New trial directed.**

* On a second trial, the prisoner was con-   † See the *Adwards' Case,* next following.
victed of murder of the second degree