PEOPLE v COUCH

Docket No. 85979. Argued April 3, 1990 (Calendar No. 6). Decided
    September 26, 1990. Rehearing denied 437 Mich 1201.

Archie L. Couch, Jr., was charged in the Detroit Recorder's Court
    with manslaughter and possession of a firearm during the
    commission of a felony after fatally wounding a fleeing felon
    who had attempted to steal his car stereo. The court, James E.
    Roberts, J., denied the defendant's motions to quash the infor-
    mation and for reconsideration, finding that the killing of the
    felon was not justifiable homicide under the common-law rule
    allowing a citizen to use deadly force to apprehend a fleeing
    felon. The court further denied the people's motion in limine
    that the jury be instructed in accordance with Tennessee v
    Garner, 471 US 1 (1985), which forbids use of deadly force by
    police officers in arresting nondangerous fleeing felons on
    Fourth Amendment grounds, as opposed to People v Whitty, 96
    Mich App 403 (1980), which recognized the common-law deadly
    force rule with respect to the apprehension of fleeing felons by
    private persons. The Court of Appeals, MacKENZIE, P.J., and
    McDONALD and WEAVER, JJ., remanded the case for a ruling on
    the prosecutor's request to instruct the jury on the basis of
    Garner (Docket No. 100136). On remand, the court held that
    Garner did not apply and that Whitty continued to apply to
    cases of arrests by private persons under MCL 764.16; MSA
    28.875. The Court of Appeals, D. E. HOLBROOK, JR., P.J., and
    MacKENZIE and N. A. BAGULEY, JJ., reversed, holding that the
    rule of Whitty should be modified in accordance with Garner
    and applied retroactively to provide that a private citizen who
    makes an arrest may use deadly force only to prevent a felon
    from fleeing where the citizen has a reasonable belief that the
    felon poses a threat of serious physical harm to that citizen or
    to other citizens (Docket No. 101936). The defendant appeals.

    In an opinion by Justice BOYLE, joined by Chief Justice RILEY
    and Justice BRICKLEY, with Justice GRIFFIN concurring only in
    the result, the Supreme Court held:

    The decision of the Court of Appeals is affirmed in part,
    insofar as it holds that Garner did not change Michigan's
    criminal law with respect to the use of deadly force to appre-

hend a fleeing felon, and reversed in part, with respect to its adoption of a new standard regarding that rule.

*Garner* did not automatically modify this state's criminal law with respect to the use of deadly force to apprehend fleeing felons. The power to define conduct as a state criminal offense lies with the individual states. Not only is the United States Supreme Court without the authority to require Michigan to make shooting a nondangerous fleeing felon a crime, it has never expressed an intent to do so. *Garner* was a civil case that made no mention of an officer's criminal responsibility for unreasonable actions.

Arguably, the Michigan Supreme Court does not have the authority to change the common-law fleeing-felon rule. The Legislature has acquiesced in this Court's construction of the statute. In any event, the Court should decline to do so. Whether police officers or citizens should be subject to criminal liability for the killing of a nondangerous fleeing felon is a question for the Legislature.

Justice LEVIN, joined by Justice GRIFFIN, concurring in reversal, stated that the Supreme Court should decline, as a matter of judicial restraint, to exercise whatever authority it may have to modify the criminal law as suggested by the prosecutor. Whether the fleeing-felon rule should be confined to situations in which the citizen seeking to make an arrest reasonably believes that the felon poses a threat of serious physical harm is a question better left to the Legislature.

There is no need to reach the question whether the Supreme Court has the authority to modify the fleeing-felon rule in a case where the question was not discussed in the Court of Appeals, and was not briefed or raised at oral argument in the Supreme Court.

Affirmed in part and reversed in part.

Justice ARCHER, joined by Justice CAVANAGH, concurring in part and dissenting in part stated that a private citizen who makes an arrest pursuant to MCL 764.16; MSA 28.875 should not be privileged to use deadly force to prevent a fleeing felon's escape unless the arresting citizen reasonably believes that the felon poses a threat of serious physical harm to the citizen or to others. If excessive force is used, the citizen may be subject to criminal prosecution commensurate with the injury caused.

176 Mich App 254; 439 NW2d 354 (1989) affirmed in part and reversed in part.

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, *John D. O'Hair,* Prose-

cuting Attorney, and *George E. Ward,* Chief Assistant Prosecutor, for the people.

*Kenneth R. Sasse* and *James A. Waske,* for the defendant.

BOYLE, J. We agree with Justice ARCHER's conclusion that the decision of the United States Supreme Court in *Tennessee v Garner,* 471 US 1; 105 S Ct 1694; 85 L Ed 2d 1 (1985), did not "automatically" modify this state's criminal law with respect to the use of deadly force to apprehend a fleeing felon. *Post,* p 441.

As Justice ARCHER explains, *Garner's* pronouncements regarding the constitutionality of the use of such force are inapplicable to private citizens such as the defendant. Regardless of the defendant's status as a private citizen, however, the prosecution's argument that *Garner* applies directly to change this state's fleeing-felon rule fails because it is premised upon the notion that the United States Supreme Court can require a state to criminalize certain conduct. Clearly, the power to define conduct as a *state* criminal offense lies with the individual states, not with the federal government or even the United States Supreme Court. While the failure to proscribe or prevent certain conduct could possibly subject the state to *civil* liability for its failure to act, or for an individual's actions, if that state, for whatever reason, chooses not to criminalize such conduct, it cannot be compelled to do so.

Moreover, we fail to see how *Garner* can be applied "directly" in any event, since the Court in that case concluded only that the use of deadly force to apprehend a fleeing felon who posed no harm to the officer or others was "unreasonable" for purposes of the *Fourth Amendment.* In other

words, *Garner* was a *civil* case which made no mention of the officer's criminal responsibility for his "unreasonable" actions. Thus, not only is the United States Supreme Court without authority to require this state to make shooting a nondangerous fleeing felon a *crime*, it has never even expressed an intent to do so.[1]

Unlike Justice ARCHER, however, we decline the opportunity to change the common-law fleeing-felon rule with respect to criminal liability to conform with *Garner*. Not only does this Court (and therefore the Court of Appeals) arguably lack the authority to do so, even prospectively, given the Legislature's adoption of and acquiescence in that rule, we must resist the temptation to do so. The question whether the common law, which allows the use of deadly force by a citizen only to apprehend a felon who is *in fact* guilty, has outlived its "utility" (*post*, p 440) is a matter of compelling public interest, demanding a balancing of legitimate interests which this Court (and therefore the Court of Appeals) is institutionally unsuited to perform. In short, it is a question for the Legislature.

I

Justice CAMPBELL observed long ago in *In re Lamphere*, 61 Mich 105, 108; 27 NW 882 (1886), that

---

[1] We are also troubled by Justice ARCHER's statement, *post*, p 441, that the defendant is not a state actor and therefore is not subject to the constitutional restraints imposed by *Garner*, while "[p]olice officers, on the other hand, are state agents, and hence, directly subordinate to *Garner's* constitutional limitations." *Id.*, p 441. In our view, even if the defendant *were* a police officer, *Garner* could not apply "directly" as the basis for a homicide charge. That would require, in effect, two different definitions of both murder and manslaughter, one for police officers and one for the rest of us. Such a scheme could raise a significant constitutional question. US Const, Am XIV; Const 1963, art 1, § 2.

while we have kept in our statute-books a general
statute resorting to the common law for all non-
enumerated crimes, there has always been a pur-
pose in our legislation to have the whole ground of
criminal law defined, as far as possible, by statute.
There is no crime whatever punishable by our
laws except by virtue of a statutory provision.[2]

Criminal homicide, or more precisely murder and
manslaughter, has been a statutory offense in
Michigan since 1846, when the state's first Penal
Code was enacted. 1846 Mich Rev Stat, title xxx,
"Of Crimes and the Punishment Thereof," ch 153,
§ 1, defined first-degree murder:

All murder which shall be perpetrated by means
of poison or lying in wait, or any other kind of
wilful, deliberate, and premeditated killing, or
which shall be committed in the perpetration, or
attempt to perpetrate any arson, rape, robbery or
burglary, shall be deemed murder of the first
degree, and shall be punished by solitary confine-
ment at hard labor in the state prison for life.[3]

Section 2 defined second-degree murder:

All other kinds of murder shall be deemed mur-
der of the second degree, and shall be punished by
imprisonment in the state prison for life, or any

---

[2] This point was affirmed in *In re Lambrecht,* 137 Mich 450, 454;
100 NW 606 (1904), in which this Court stated that "[w]e can look
only to the statute for any crime punishable in this State. We look to
the common law for definitions and principles in our criminal juris-
prudence, but, unless the statute provides a penalty, acts criminal at
the common law are not crimes in this State."

[3] The current version of the first-degree murder statute provides
that "[m]urder which is perpetrated by means of poison, lying in wait,
or other wilful, deliberate, and premeditated killing, or which is
committed in the perpetration, or attempt to perpetrate arson, crimi-
nal sexual conduct in the first or third degree, robbery, breaking and
entering of a dwelling, larceny of any kind, extortion, or kidnapping,
is murder of the first degree, and shall be punished by imprisonment
for life." MCL 750.316; MSA 28.548.

term of years, in the discretion of the court trying the same.[4]

Section 10 referred to the crime of manslaughter:

> Every person who shall commit the crime of manslaughter, shall be punished by imprisonment in the state prison, not more than fifteen years, or by fine not exceeding one thousand dollars, or both, at the discretion of the court.[5]

Obviously, the crimes of murder and manslaughter are not defined in these statutes in the sense that the elements of those offenses, along with any recognized defenses, are included in the language of the statutes. That does not mean, however, that they are left wholly undefined. As Justice Jackson stated in *Morissette v United States,* 342 US 246, 263; 72 S Ct 240; 96 L Ed 288 (1952):

> [W]here [a legislature] borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed. In such case, absence of contrary direction may be taken as satisfaction with widely accepted definitions, not as a departure from them.

Similarly, in *People v Schmitt,* 275 Mich 575, 577;

---

[4] The current version of the second-degree murder statute provides that "[a]ll other kinds of murder shall be murder of the second degree, and shall be punished by imprisonment in the state prison for life, or any term of years, in the discretion of the court trying the same." MCL 750.317; MSA 28.549.

[5] The current version of the manslaughter statute provides that "[a]ny person who shall commit the crime of manslaughter shall be guilty of a felony punishable by imprisonment in the state prison, not more than 15 years or by fine of not more than 7,500 dollars, or both, at the discretion of the court." MCL 750.321; MSA 28.553.

267 NW 741 (1936), this Court stated that "[i]n construing a statute wherein a public offense has been declared in the general terms of the common law, without more particular definition, the courts generally refer to the common law for the particular acts constituting the offense." Where the Legislature "has shown no disposition to depart from the common-law definition, *therefore it remains.*" *Id.* (Emphasis added.)[6]

To the extent that the Legislature intended to convey "satisfaction with" the existing common-law definitions of murder and manslaughter and to adopt and embrace those definitions, *Morissette, supra,* p 263, it is debatable whether this Court still has the authority to change those definitions. The Legislature is presumed to have accepted the then-existing common-law rule that "[a]ny private person (and *a fortiori* a peace-officer) [may arrest a fleeing felon] . . . and if *they kill him,* provided he cannot otherwise be taken, it is justifiable . . . ." 4 Blackstone, Commentaries, p 293 (emphasis in original).[7] Thus, murder and manslaughter,

---

[6] See also *People v Potter,* 5 Mich 1, 5 (1858), in which it was stated, "Murder is where a person of sound memory and discretion unlawfully kills any reasonable creature in being, in the peace of the state, with malice prepense or aforethought, either express or implied. *This, the common law definition, is still retained in our statute. It speaks of the offense as one already ascertained and defined, and divides it into degrees . . . .*" (emphasis added); *People v Utter,* 217 Mich 74, 86; 185 NW 830 (1921) ("While murder is defined by statute in this State, and the killing of a human being under specified circumstances made murder in the first degree, *it also includes the common-law definition . . . .*"). (Emphasis added.)

[7] See also Perkins & Boyce, Criminal Law (3d ed), p 1099:

Firmly established in the common law of England was the privilege to kill a fleeing felon if he could not otherwise be taken,[42] a privilege extended to the private person as well as to the officer . . . .

---

[42] "If a felony be committed and the felon fly from justice, . . . it is the duty of every man to use his best endeav-

arguably, are no longer common-law crimes in this state, but rather became statutory crimes as early as 1846, and we are no longer free to redefine what is not justifiable homicide by holding that a citizen is "not privileged to use deadly force to prevent a fleeing felon's escape unless the arresting citizen reasonably believes that the felon poses a threat of serious physical harm to that citizen or to others." *Post,* p 440.[8]

We need not resolve our authority to modify the common-law rule, however, because we find in any event that the presumption of legislative adoption is in this case affirmed by fifty years of legislative acquiescence in this Court's decision in *People v Gonsler,* 251 Mich 443, 446-447; 232 NW 365 (1930), in which we approved the trial court's instruction that

> "[b]oth officers and private persons seeking to prevent a felon's escape must exercise reasonable care to prevent the escape of the felon without doing personal violence, *and it is only where killing him is necessary to prevent this escape, that the killing is justified . . . . If a killing is not justifiable, it is either murder or manslaughter."* [Emphasis added.]

ours for preventing an escape; and if in the pursuit the felon be killed, where he cannot otherwise be overtaken, the homicide is justifiable." 1 East, Pleas of the Crown 298 (1803).

---

[8] We acknowledge this Court's opinion in *People v Stevenson,* 416 Mich 383; 331 NW2d 143 (1982), concluding generally that this Court does have the authority to change the common law so as to enlarge the scope of a defendant's criminal liability, and in particular that it had the authority to abolish the common-law "year and a day" rule. The *Stevenson* opinion, however, hardly contains an exhaustive analysis of the question, and cites no authority in support of its conclusion. Moreover, *Stevenson* did not involve a claim of legislative adoption of the common-law rule, nor did it involve legislative acquiescence in the face of a ruling by this Court, as occurred after *People v Gonsler,* 251 Mich 443; 232 NW 365 (1930).

II

Regardless of whether this Court has the authority to change the law of homicide, and make criminal something that has never before been a crime in this state, we nonetheless decline to do so in this case. "To declare what shall constitute a crime, and how it shall be punished, is an exercise of the sovereign power of a state, and is inherent in the legislative department of the government." *People v Hanrahan,* 75 Mich 611, 619; 42 NW 1124 (1889). This is particularly true here.

The definitions of a "nondangerous" felony, or who is a nondangerous felon, and how such a felon may be apprehended are quintessentially matters of policy. They involve the delicate weighing and balancing of the particular nature and quality of the felonious intrusion on a citizen's interests, on the one hand, and the protection of the felon's interest in longevity on the other. There is an obvious difference, for example, in the citizen's interest in the sanctity of his home and his interest in his automobile or power boat, just as there is a clear distinction between setting fire to a dwelling and stealing a $200 bicycle, although all are felony/property offenses. Presumably for this reason, the penal codes of some states grant the authority to apprehend a fleeing felon through the use of deadly force if the arrest is for a "forcible" felony, and at least one state has defined forcible felony to include, among others, arson and burglary.[9]

Since the Legislature has evidenced no general intent to reduce the penalties for "mere" property offenses, or, for that matter, major drug offenses, it may well be that the Legislature would not refine such distinctions with respect to the fleeing-felon

---

[9] Perkins & Boyce, *supra,* p 1105.

rule, and would draw the line by saying that a person *who is in fact guilty*[10] and chooses to flee from the scene of a felony assumes a risk to life and limb. For example, the Legislature may decide that the civil penalties for an improper exercise of the right to use deadly force, as well as the fact that the private citizen acts at his peril and is criminally responsible if he is wrong, are enough of a deterrent to the misuse of such authority.

The point is not that another rule may be wiser, or that there are not situations in which the loss of a felon's life is tragic, but rather that it is the Legislature that must determine whether the common-law rule has outlived its "utility." Stated otherwise, it is hard to conceive of an issue more demanding of public debate and the give-and-take of the legislative process than whether the citizens of Michigan are willing to assume the risk that certain criminals should remain at large rather than be subjected to the risk of harm at the hands of their victims. The clear question of policy, whether police officers or citizens should be subject to *criminal* liability for the killing of a nondangerous fleeing felon, is one for the Legislature, not this Court.[11]

---

[10] Perkins & Boyce, *supra*, pp 1099-1100.

In other words according to the English common law a *private person* was never privileged to use deadly force merely to stop the flight of one he was seeking to arrest without a warrant, if that one was in fact innocent. [Emphasis in original.]

[11] As the California Court of Appeals recently stated in *People v Gilmore*, 249 Cal Rptr 914, 921, n 5 (1988), after concluding that *Garner* had not automatically modified that state's fleeing-felon rule, "we have distilled from the governing statute [by reference to the common law] and applied to the undisputed facts the legal principles which we . . . believe to be controlling. If it is thought desirable to change the statute for future cases, that is the responsibility of the Legislature." Although review of the Court of Appeals opinion was denied by the California Supreme Court, that court did direct that it not be published in the official reporter. 203 Cal App 3d 612 (1988).

## CONCLUSION

We affirm in part the decision of the Court of Appeals insofar as it holds that *Garner* did not change this state's criminal law with respect to the use of deadly force to apprehend a fleeing felon. We therefore concur in Justice ARCHER's opinion to the extent that it so holds. However, we reverse the decision of the Court of Appeals to "adopt[ ] a new standard," *People v Couch,* 176 Mich App 254, 260; 439 NW2d 354 (1989), with respect to that rule.

RILEY, C.J., and BRICKLEY, J., concurred with BOYLE, J.

GRIFFIN, J., concurred only in the result.

LEVIN, J. (*concurring in reversal*). We agree that *Tennessee v Garner,* 471 US 1; 105 S Ct 1694; 85 L Ed 2d 1 (1985), did not modify the criminal law of this state.

We are persuaded that this Court should decline, as a matter of judicial restraint, to exercise whatever authority it may have to modify the criminal law as urged by the prosecutor.[1] Whether the fleeing-felon rule should be confined to situations where the citizen seeking to make an arrest reasonably believes the felon poses a threat of serious physical harm is a question better left to the Legislature. We thus see no need to reach the question whether this Court has the authority to modify the fleeing-felon rule.

We do not share the California high court's apparent uneasiness with the lower court's discussion in *Gilmore.*

[1] The lead opinion also states that whether or not this Court has the authority to modify the fleeing-felon rule, it should not do so. See *ante,* p 422 ("Regardless of whether this Court has the authority to change the law of homicide, and make criminal something that has never before been a crime in this state, we nonetheless decline to do so in this case").

The suggestion in the lead opinion that this Court might not have the authority to modify the criminal law implicates this Court's decision in *People v Stevenson,* 416 Mich 383; 331 NW2d 143 (1982). There, the Court abolished the common-law "year and a day" rule,[2] and in so doing rejected Stevenson's argument that "this Court lacks the power to change the common law so as to enlarge the scope of criminal liability . . . ."[3]

As a result of the Court's decision in *Stevenson,* prisoners are now serving lengthy sentences on the basis of convictions that could not have been obtained before this Court modified the "common law" of homicide. In suggesting that this Court might not have the authority to modify the criminal law, the lead opinion calls into question the decision in *Stevenson* as well as all convictions obtained in contravention of the common-law "year and a day" rule.

It is inappropriate to discuss the authority of this Court to modify the criminal law—a question of undeniable jurisprudential importance—in a case where the question was not discussed by the Court of Appeals,[4] was not briefed,[5] and was not raised at oral argument.

---

[2] We hold that the "year and a day" rule is part of the common law of this state; that the rule is hereby abrogated; and that the abrogation of the rule should not, and will not, be given retroactive effect. [*Id.,* p 386.]

[3] *Id.,* p 390. This Court said:

The suggestion that crimes can *only* be defined by statute is not well taken, particularly in light of the fact that, in Michigan, murder is defined by the common law and not by statute. [*Id.,* p 391. Emphasis in original.]

Like the lead opinion (see *ante,* pp 417-418), Stevenson relied on *In re Lamphere,* 61 Mich 105; 27 NW 882 (1886). See *Stevenson,* pp 390-391.

[4] *People v Couch,* 176 Mich App 254; 439 NW2d 354 (1989).

[5] Couch does not contend this Court lacks the authority to modify the fleeing-felon rule. Indeed, he asserts the opposite:

We concur in the reversal of the decision of the Court of Appeals.

Griffin, J., concurred with Levin, J.

Archer, J. We granted leave to consider whether the common-law rule of *People v Whitty,* 96 Mich App 403; 292 NW2d 214 (1980), permitting a private person to use deadly force to apprehend a fleeing felon should be modified in light of *Tennessee v Garner,* 471 US 1; 105 S Ct 1694; 85 L Ed 2d 1 (1985), which, under the Fourth Amendment, forbids police officers to use deadly force in arresting nondangerous fleeing felons, and, if so, whether such a modification would violate the prohibition against ex post facto laws[1] applicable to the judiciary through the Due Process Clauses of the United States and Michigan Constitutions.[2]

We would hold that a private citizen making an arrest pursuant to MCL 764.16; MSA 28.875 is not privileged to use deadly force to prevent a fleeing felon's escape unless the arresting citizen reasonably believes that the felon poses a significant threat of serious physical harm to the citizen or to others. In the event excessive force is used, that citizen may be subject to criminal prosecution. We would further hold that such a rule should have prospective application only.

---

The determination of whether or not to modify the common law rule may well be one that is better left to the Legislature. Both this Court and the Legislature have the constitutional power to change the common law. . . . Assuming that this Court determines that it rather than the Legislature should determine this issue, Defendant urges against modification of the common law rule.

[1] US Const, art I, § 10; Const 1963, art 1, § 10.

[2] US Const, Am XIV; Const 1963, art 1, § 17. See *People v Stevenson,* 416 Mich 383, 395; 331 NW2d 143 (1982), and *People v Dempster,* 396 Mich 700, 714-718; 242 NW2d 381 (1976).

Accordingly, we would affirm that part of the
Court of Appeals decision modifying the common-
law deadly force rule in accordance with *Garner*.
However, we would reverse that part of the deci-
sion which applied the rule retroactively, and we
would remand this case to the trial court, which, if
there is a trial, should instruct the jury, if appro-
priate, in accordance with the common-law rule of
*People v Whitty*.

I

FACTS AND PROCEEDINGS

On October 15, 1986, at approximately 1:10 P.M.,
defendant Archie L. Couch, Jr., was in his office in
Detroit when he heard his car alarm. He promptly
left his office and walked to the adjacent parking
lot where his car was parked. As he approached
his car, he observed a man standing near the
driveway of the parking lot who yelled something,
and then ran eastward. Upon reaching his car, the
defendant noticed that the front driver's window
was smashed and observed Alfonso Tucker, Jr.,
sitting in the middle of the car's front seat, bend-
ing forward, apparently having dismantled the
car's stereo.

The defendant then reached for his revolver
which was in his waistband and for which he had
a license. Walking to the rear of the car, the
defendant held the gun in the air and reportedly
said, " 'Get out of the car and go with me so I can
call the police.' " Tucker then slid over to the
passenger door. The defendant walked around the
rear of the car toward the same door. Tucker got
out of the car stating, " 'Okay, man, don't shoot.' "
The defendant then recalled saying, " 'Come on
with me, I am going to call the police.' " Tucker
then lunged toward the defendant, and the defen-

dant fired one shot which apparently missed. Tucker proceeded to run away from the defendant. When he was approximately twenty to thirty feet away, the defendant fired two more shots which fatally wounded him.

The defendant immediately directed his receptionist to call the police. After the police arrived and defendant gave them a full statement, he was arrested and charged with manslaughter under MCL 750.329; MSA 28.561 and with possession of a firearm during the commission of a felony under MCL 750.227b; MSA 28.424(2).

On November 17, 1986, the defendant was bound over for trial as charged. In the trial court, he moved to quash, arguing that the killing of Alfonso Tucker, Jr., was justifiable homicide under the common-law rule allowing a citizen to use deadly force[3] to apprehend a fleeing felon. See *Whitty, supra.* This motion was denied, as was his later motion for reconsideration.

The prosecutor then moved in limine that the jury be instructed in accordance with *Garner's* restriction of deadly force, as opposed to *Whitty's* allowance of it. The trial court denied this motion, reasoning that it was too early in the proceedings to rule on a jury instruction.

On appeal, the Court of Appeals remanded the case, instructing the trial court to rule on the prosecution's request for a jury instruction on the basis of *Garner.* On remand, the trial court held that *Garner* did not apply to the instant facts and again denied the prosecutor's instructional request. The prosecutor appealed, and the trial court

[3] References to the term "deadly force" throughout this opinion shall be governed by the following definition "where the defendant's acts are such that the natural, probable, and foreseeable consequence of said acts is death." *People v Pace,* 102 Mich App 522, 534; 302 NW2d 216 (1980).

further ordered that the trial be stayed pending appellate review of its ruling that the rule of *Whitty* and not that of *Garner* should be cited in the instructions to the jurors.

On April 3, 1989, the Court of Appeals reversed, holding that the rule of *Whitty* should be modified in accordance with *Garner* to provide that a private citizen who makes an arrest may use deadly force only to prevent a felon from fleeing where the citizen has a reasonable belief that the felon poses a threat of serious physical harm to that citizen or to other citizens. The Court further held that *Garner* applied retroactively so as to criminalize the instant shooting.[4] We subsequently granted leave to appeal.[5]

## II

Today we are called upon to analyze and determine the powers of citizens to effect arrests in this state. MCL 764.16; MSA 28.875, the citizens arrests statute, provides:

> A private person may make an arrest in the following situations:
> (a) For a felony committed in the private person's presence.
> (b) If the person to be arrested has committed a felony although not in the private person's presence.
> (c) If the private person is summoned by a peace officer to assist the officer in making an arrest.

Defendant Couch was authorized by MCL 764.16(a); MSA 28.875(a) to arrest Alfonso Tucker, Jr. However, authorization for use of deadly force in an arrest attempt was not provided by the

---

[4] *People v Couch*, 176 Mich App 254; 439 NW2d 354 (1989).

[5] *People v Couch*, 434 Mich 851 (1990).

statute, and thus we must turn to the common law.

The common-law rule initially concerned the actions of police officers. In Hale's Pleas of the Crown, it is stated:

> "[I]f persons that are pursued by these officers for felony or the just suspicion thereof . . . shall not yield themselves to these officers, but shall either resist or fly before they are apprehended or being apprehended shall rescue themselves and resist or fly, so that they cannot be otherwise apprehended, and are upon necessity slain therein, because they cannot be otherwise taken, it is no felony." [*Garner, supra* at 12, quoting 2 Hale, Historia Placitorum Coronae 85 (1736).]

In 1930, this Court in *People v Gonsler,* 251 Mich 443, 446-447; 232 NW 365 (1930), applied this common-law principle to private arrests:

> "Both officers *and* private persons seeking to prevent a felon's escape must exercise reasonable care to prevent the escape of the felon without doing personal violence, and it is only where killing him is necessary to prevent this escape, that the killing is justified . . . ." [Emphasis added.]

The clearest statement concerning Michigan's continued adherence to the common-law deadly force rule was made by the Court of Appeals in *People v Whitty, supra.* In that case, Roosevelt Whitty, the manager of a party store in Highland Park, attempted an arrest of an armed robber. In apprehending the assailant, Whitty fatally wounded him. Mr. Whitty was convicted of first-degree murder.

On appeal, the Court of Appeals reversed, applying the common-law rule permitting the use of

deadly force. The Court reasoned that the common-law rule should be maintained because:

> The fact remains that the police cannot be everywhere they are needed at once. The occasion may arise where the private citizen is confronted with the choice of attempting a citizen's arrest or letting the felon escape. In order to make the citizen's arrest, it is regrettable, but sometimes necessary, to make use of deadly force. The common law in Michigan recognizes this but still stops far short of granting the private citizen a license to hunt down and kill those suspected of committing a felony. The use of deadly force is not justified if the person to be arrested is not in fact a felon. Additionally, and most importantly, the use of deadly force must be necessary either to meet deadly force or to prevent the felon's escape. [*Whitty* at 416. See also *People v Smith,* 148 Mich App 16; 384 NW2d 68 (1985); *Werner v Hartfelder,* 113 Mich App 747; 318 NW2d 825 (1982); *Jenkins v Starkey,* 95 Mich App 685; 291 NW2d 170 (1980).]

Five years after the decision in *Whitty,* the United States Supreme Court in *Tennessee v Garner* held that under the Fourth Amendment of the United States Constitution,[6] police officers cannot resort to deadly force in making an arrest unless such force is necessary to prevent the escape of a fleeing felon *and* the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or

---

[6] US Const, Am IV, provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

to others. The basis of the Court's ruling was that the killing of a fleeing suspect was an unreasonable seizure under the Fourth Amendment. The Court reasoned:

> The use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable. It is not better that all felony suspects die than that they escape. Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so. It is no doubt unfortunate when a suspect who is in sight escapes, but the fact that the police arrive a little late or are a little slower afoot does not always justify killing the suspect. A police officer may not seize an unarmed, nondangerous suspect by shooting him dead. [*Id.* at 11.]

*Garner*'s constitutional restriction of police power to arrest causes us to question the continued validity of the common-law rule presently governing private citizen arrests in Michigan. Three interrelated questions are presented: First, does *Garner* provide controlling authority to automatically modify *Whitty*'s common-law deadly force rule, and, if not, is it persuasive authority for modifying the rule today? Lastly, should *Garner* or any modified rule be applied in this case?

### III

Initially, we conclude that *Garner*'s limitation of the privilege previously available to arresters in apprehending felons, grounded upon a Fourth Amendment seizure analysis, while highly pertinent to the resolution of this case, does not control its outcome unless citizen arrests are found to

represent state action rather than action solely attributed to private persons.

We do not believe citizen arrests are state action. Thus, in accordance with the holding of the Court of Appeals, we conclude that *Garner* provides only persuasive and not controlling authority for application in the instant case.

A

The prosecutor first urges this Court to rule that arrests, whether performed by a citizen or a police officer, of themselves are state action, and that any discussion or limitation of the means available to arresters is automatically subordinate to the Fourth and Fourteenth Amendments of the United States Constitution. In support, the prosecution argues that the wording of the arrest statutes, MCL 764.15; MSA 28.874 for police[7] and MCL 764.16; MSA 28.875 for private citizens, is "not

---

[7] MCL 764.15; MSA 28.874 provides:

(1) A peace officer, without a warrant, may arrest a person in the following situations:

(a) When a felony, misdemeanor, or ordinance violation is committed in the peace officer's presence.

(b) When the person has committed a felony although not in the presence of the peace officer.

(c) When a felony in fact has been committed and the peace officer has reasonable cause to believe that the person has committed it.

(d) When the peace officer has reasonable cause to believe that a felony has been committed and reasonable cause to believe that the person has committed it.

(e) When the peace officer has received positive information by written, telegraphic, teletypic, telephonic, radio, or other authoritative source that another peace officer holds a warrant for the arrest.

(f) When the peace officer has received positive information broadcast from a recognized police or other governmental radio station, or teletype, as may afford the peace officer reasonable cause to believe that a felony has been committed and reasonable cause to believe that the person has committed it.

(g) When the peace officer has reasonable cause to believe

essentially different." We are not persuaded. Similarly worded statutory authorization which, in this case, is questionable to begin with is, in our view, one of the few parallels between police and citizen arrests that exists.

The manifest differences between police arrests, the focus of *Garner,* and citizen arrests, the focus of *Whitty,* prohibit us from easily grouping the terms under one generalized heading. Although, the prosecutor correctly notes that arrests are made for the common purpose of commencing state prosecutions, the manner and means of ef-

that the person is an escaped convict, has violated a condition of parole from a prison, has violated a condition of probation imposed by a court, or has violated a condition of a pardon granted by the executive.

(h) When the peace officer has reasonable cause to believe that the person was, at the time of an accident, the driver of a vehicle involved in the accident and was operating the vehicle upon a public highway or other place open to the general public, including an area designated for the parking of vehicles, in the state while in violation of section 625(1) or (2) of the Michigan vehicle code, Act No. 300 of the Public Acts of 1949, being section 257.625 of the Michigan Compiled Laws, or of a local ordinance substantially corresponding to section 625(1) or (2) of Act No. 300 of the Public Acts of 1949.

(i) When the peace officer has reasonable cause to believe that the person was, at the time of an accident, the driver of a snowmobile as defined by Act No. 74 of the Public Acts of 1968, as amended, being sections 257.1501 to 257.1518 of the Michigan Compiled Laws, involved in the accident and was driving the snowmobile while under the influence of an intoxicating liquor; a controlled substance as defined in section 7104 of the public health code, Act No. 368 of the Public Acts of 1978, as amended, being section 333.7104 of the Michigan Compiled Laws; or a combination of intoxicating liquor and a controlled substance.

(j) When the peace officer has reasonable cause to believe that the person was, at the time of an accident, the driver of an ORV as defined in Act No. 319 of the Public Acts of 1975, as amended, being sections 257.1601 to 257.1626 of the Michigan Compiled Laws, involved in the accident and was driving the ORV while under the influence of an intoxicating liquor; a controlled substance, as defined in section 7104 of Act No. 368 of the Public Acts of 1978, as amended; or a combination of intoxicating liquor and a controlled substance.

fecting arrests varies significantly with respect to police officers and civilians.

For example, police officers not only are licensed to carry weapons, they are intensely trained in their use. The responsibility for the training is borne by city and state police departments, so that trained officers become agents of the state. See *Ross v Consumers Power Co (On Rehearing)*, 420 Mich 567, 661; 363 NW2d 641 (1984). Officers are instructed to perform tasks such as arrests as a matter of *public* duty,[8] not, as is the case with civilians, as a matter of *private* privilege. Thus, despite common ends, private arresters are limited to "stand[ing] in the shoes" and "playing the part" of police officers.[9] Plainly, there are a significant number of unbridged gaps and obvious differences between the means used by skilled, trained, and sophisticated police officers and those used by untrained, and inexperienced civilians. For this reason, we conclude that police arrests and private arrests cannot be simplistically defined or categorized as being one and the same. A private person's manner in arresting a felon cannot automatically be attributed to the state.

The prosecutor also contends that because a citizen arrest is authorized by statute, it is conduct discharged "under [the] color" of law, and therefore, automatically attributable to the state. In support, the prosecution cites *United States v Price,* 383 US 787, 794, n 7; 86 S Ct 1152; 16 L Ed 2d 267 (1966):

In cases under § 1983,[10] "under color" of law

---

[8] See Pearson, *The right to kill in making arrests,* 28 Mich L R 957 (1930), citing *State v Dunning,* 177 NC 559; 98 SE 530 (1919); *Durham v State,* 199 Ind 567; 159 NE 145 (1927).

[9] *People v Couch,* 176 Mich App 259.

[10] Every person who, under color of any statute, ordinance,

has consistently been treated as the same thing as the "state action" required under the Fourteenth Amendment.

To the contrary, the Supreme Court in *Flagg Bros, Inc v Brooks,* 436 US 149, 164; 98 S Ct 1729; 56 L Ed 2d 185 (1978) reasoned:

> [Despite] [o]ur cases [that] state "that a State is responsible for the . . . act of a private party when the State, by its law, has compelled the act[,]" [t]his Court . . . has never held that a State's mere acquiescence in a private action converts that action into that of the State. [Citations omitted.]

In essence, the Court established that an action by a private party pursuant to a statute, without "something more,"[11] is not sufficient to justify a characterization of that party as a "state actor."

regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia. [42 USC 1983.]

[11] The "something more" needed to elevate an action discharged "under color" of law to state action was described by the Supreme Court in *Lugar v Edmondson Oil Co,* 457 US 922, 939; 102 S Ct 2744; 73 L Ed 2d 482 (1982):

1) The "public function" test is found in *Terry v Adams,* 345 US 461, 469; 72 S Ct 809; 97 L Ed 1152 (1953), where the Court struck down discriminatory acts of a private political organization, holding, "[i]t violates the Fifteenth Amendment for a state, by such circumvention, to permit within its borders the use of any device that produces an equivalent of the prohibitive election";

2) The "state compulsion" test is found in *Adickes v S H Kress & Co,* 398 US 144, 170; 90 S Ct 1598; 26 L Ed 2d 142 (1970), where the Court held that a party can establish a § 1983 claim for violation of equal protection if it is proven that service was refused because of a state enforced custom;

We do not believe that the conduct of defendant is chargeable to the State of Michigan. Beyond providing the basic statutory framework, the state has absolutely no involvement in the idiosyncratic application of the citizen arrest statute. The state simply cannot bear responsibility for the individual acts of an uncertain number of private persons, each of whom has the privilege at any given moment to attempt the apprehension of a suspected felon. Patent distinctions exist between the means used by trained police officers and those used by members of the general public to effect arrests. Even though police and citizen arrests are carried out with the common goal of maintaining public peace, this does not automatically equate private efforts with those of the state. See *People v Holloway*, 82 Mich App 629; 267 NW2d 454 (1978) (the acts of a security guard hired for the purpose of keeping the peace was found not to be subordinate to the constitution). We do not believe the citizen's arrest statute provides the "something more" needed to "lend the weight of the State to [individual] decisions." See *Lugar v Edmondson Oil Co*, 457 US 922, 937, 939; 102 S Ct 2744; 73 L Ed 2d 482 (1982).

---

3) The "nexus" test is found in *Jackson v Metropolitan Edison Co*, 419 US 345, 351; 95 S Ct 449; 42 L Ed 2d 477 (1974), where the Court held that state action is present where there is a sufficiently close or symbiotic nexus between the state and the challenged entity's act of deprivation so that the action may be fairly treated as an action of the state itself;

4) The "joint action" test is found in *Flagg Bros, supra* at 157 and *Price, supra* at 794, where actions of private persons with the state rise to the level necessary to characterize them as state acts.

We note first that the § 1983 actions upon which these tests are based involve *civil* claims traditionally brought against state officials or private persons to redress violations of civil and constitutional rights, e.g., *Garner, supra*. Because this case principally involves consideration of whether a citizen should be held *criminally* liable for the use of deadly force to stop a fleeing felon, we find any discussion of the abridgement of civil rights inappropriate.

Accordingly, we conclude that the instant case is not controlled by or subordinate to the Fourth and Fourteenth Amendments. We further conclude that *Garner* does not provide controlling authority for the resolution of this case.

### B

We do agree with the Court of Appeals, however, that *Garner* does provide persuasive authority. Generally, the common-law rule permitting use of deadly force to effectuate an arrest applies to "[b]oth officers *and* private persons seeking to prevent a felon's escape . . . ." 3A Gillespie, Michigan Criminal Law & Procedure (2d ed), § 1691(d), p 231. (Emphasis added.) See *Gonsler* at 446-447.

Because the common-law rule was the source of authority in this state for both police and civilian use of deadly force to stop fleeing felons, as a practical matter we believe *Garner's* expressed limitations on the use of deadly force by police officers should be applied to civilians as well.

The lead opinion correctly contends that the Court has no jurisdiction to amend statutes but that it has the authority to amend or change the common law. We are not purporting to modify the elements of the statutory offense. The rule permitting private citizens to use deadly force to prevent a fleeing felon's escape is a defense to homicide, rather than an element of either manslaughter or murder. We would merely amend the common law, as the Court is authorized to do by the Michigan Constitution.[12]

It is true that the Legislature has authorized private citizens to make arrests, see MCL 764.16; MSA 28.875. However, the statutory language does not support the contention that the Legislature

---

[12] Const 1963, art 3, § 2; art 6, § 1.

authorized the use of deadly force by private citizens arresting a fleeing felon. Legislative history is silent on this issue. Such authorization was made by case law, not statute. See *Gonsler, Whitty, supra.*

Providing some practical reasons why the common-law rule should not be applied in the present, the Court in *Garner* expressed:

> It has been pointed out many times that the common-law rule is best understood in light of the fact that it arose at a time when virtually all felonies were punishable by death. "Though effected without the protections and formalities of an orderly trial and conviction, the killing of a resisting or fleeing felon resulted in no greater consequences than those authorized for punishment of the felony of which the individual was charged or suspected." [*Garner* at 13-14. Citations omitted. See also *Whitty* at 415, citing LaFave & Scott, Criminal Law, § 56, p 405; Pearson, *The right to kill in making arrests,* 28 Mich L R 957, 974-975 (1930); *Commonwealth v Chermansky,* 430 Pa 170; 242 A2d 237 (1968).]

Like the *Garner* Court, we are not persuaded that the shooting of a nondangerous fleeing suspected felon is so vital as to outweigh the sanctity of the suspect's interest in his own life.[13] The

---

[13] We also acknowledge the logic inherent in § 3.07(2)(b)(iv)(1)(2) of the Model Penal Code:

(b) The use of deadly force is not justifiable under this Section unless:

\* \* \*

(iv) the actor believes that:

(1) the crime for which the arrest is made involved conduct including the use or threatened use of deadly force; or

(2) there is a substantial risk that the person to be arrested will cause death or serious bodily harm if his apprehension is delayed. [ALA, Model Penal Code: Proposed Official Draft (1962), pp 56-57.]

consequences of the continued use of an unmodified common-law deadly force rule, death or serious injury, far outweigh the rule's alleged utility especially in this case where the suspected felon did not appear to pose a serious threat of harm and did voluntarily retreat pleading, "Okay, man, don't shoot."

The argument that "police cannot be everywhere they are needed at once," *Whitty* at 416, no longer has the force it once did because *Garner* has since limited what police officers can do even when they arrive promptly at the scene of a felony. In *People v Coons,* 158 Mich App 735, 739; 405 NW2d 153 (1987), the Court of Appeals reasoned that despite *Garner,* the Court could "not give [a] defendant permission to use deadly force in a situation where it would be denied to a law enforcement officer having *broader* powers to effect an arrest." (Emphasis added.) We agree.

Accordingly, we would hold that a private citizen effecting an arrest pursuant to MCL 764.16; MSA 28.875 is not privileged to use deadly force to prevent a fleeing felon's escape unless the arresting citizen reasonably believes that the felon poses a threat of serious physical harm to that citizen or to others. In the event excessive force is used, the citizen arrester may be subject to criminal prosecution commensurate with the injury caused.

IV

Upon the basis of the erroneous belief that

Our citation of these sections of the Model Penal Code should not be deemed adoption of them. We believe that is best left to the Legislature. At present, Michigan has no statute which deals with the use of deadly force to arrest. Until the Legislature enacts such a provision, Michigan must be guided by its case law. We simply find that the modification of the common-law rule in the Model Penal Code achieves the fairest and most balanced result.

defendant Couch was a "state actor" whose acts were subordinate to the Fourth and Fourteenth Amendments, the prosecutor argues that our *Garner*-based decision should be applied retroactively. Alternatively, the prosecutor argues that *Garner's* 1985 release automatically modified the common-law rule articulated in *Whitty.* We disagree with both· assertions and would hold that such an amendment should have prospective application only.

*Garner* provided substantial, persuasive guidance in the fashioning of our new standard. Yet, its holding did not automatically modify *Whitty.* The citizen arrester in *Whitty* and in this case were not "state actors," and, therefore, not subject to the constitutional restraints imposed by *Garner.* Police officers, on the other hand, are state agents, and hence, directly subordinate to *Garner's* constitutional limitations.

Until now, the common-law rule of *Whitty* has remained intact. On October 15, 1986, defendant Couch's use of deadly force in attempting to arrest Alfonso Tucker, Jr., was consistent with *Whitty.* We believe that any other conclusion would deprive the defendant of his due process right to a fair and specific notice of the conduct for which he may be criminally penalized.[14] Nor can we condone or ourselves engage in what we consider to be forbidden judicial action ex post facto. See *People v Stevenson,* 416 Mich 383, 395; 331 NW2d 143

[14] Even upon the improbable finding that defendant was a state actor whose acts were controlled by the ruling in *Garner,* the defendant would still prevail here on the basis of the fact that at the time of the shooting neither *Garner* itself, the courts, nor the Legislature provided notice in accordance with due process of the fact that civilian arrests pursuant to the common-law deadly force rule were, henceforth, unquestionably prohibited in Michigan. Absent the clear statement by this Court today, defendant's actions on October 15, 1986, could at best be characterized as "probably" proscribed, which would be an unacceptable foundation upon which to base a conviction.

(1982), citing *Marks v United States,* 430 US 188; 97 S Ct 990; 51 L Ed 2d 260 (1977), and *Bouie v City of Columbia,* 378 US 347; 84 S Ct 1697; 12 L Ed 2d 894 (1964); *People v Demster,* 396 Mich 700, 714-718; 242 NW2d 381 (1976). We conclude that such a modified rule should not be applicable to defendant Couch's actions of October 15, 1986, and that the rule should have prospective application only.

### CONCLUSION

We conclude that defendant Couch's actions are to be analyzed under the common-law standard articulated in *Whitty.* Accordingly, we would affirm in part and reverse in part, the decision of the Court of Appeals.

CAVANAGH, J., concurred with ARCHER, J.