# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

BRENT WILLIAM BOGSETH,

Defendant-Appellant.

UNPUBLISHED
February 13, 2018

No. 335864
Van Buren Circuit Court
LC No. 16-020317-FC

Before: MARKEY, P.J., and M. J. KELLY and CAMERON, JJ.

PER CURIAM.

Defendant, Brent Bogseth, appeals by right his jury conviction of first-degree premeditated murder of his wife, Kimberly Bogseth.[1] See MCL 750.316(1)(a). The trial court sentenced Bogseth to serve life in prison without the possibility of parole. On appeal, Bogseth argues that there was insufficient evidence to support his conviction and that he did not receive a fair trial. For the reasons more fully explained below, we affirm.

## I. SUFFICIENCY OF THE EVIDENCE

## A. STANDARD OF REVIEW

Bogseth first maintains that there was insufficient evidence to support his conviction of first-degree premeditated murder. This Court reviews a challenge to the sufficiency of the evidence by examining the "record evidence de novo in the light most favorable to the prosecution to determine whether a rational trier of fact could have found that the essential elements of the crime were proved beyond a reasonable doubt." *People v Roper*, 286 Mich App 77, 83; 777 NW2d 483 (2009).

---

[1] For ease of reference, we shall refer to Kimberly Bogseth as Kim. We shall use Bogseth to refer to Brent Bogseth alone.

B. ANALYSIS

The Legislature defined first-degree murder to be, in relevant part, "[m]urder perpetrated by means of poison, lying in wait, or any other willful, deliberate, and premeditated killing," or murder "committed in the perpetration of, or attempt to perpetrate" certain enumerated offenses. MCL 750.316(1). Thus, first-degree murder is second-degree murder with an added element: premeditation (or the use of poison or lying in wait) or the perpetration or attempted perpetration of an enumerated offense. *People v Carter*, 395 Mich 434, 437; 236 NW2d 500 (1975). When first-degree murder is premised on deliberation and premeditation, the prosecution must prove that the defendant acted with the intent to kill the victim and must show that he or she acted deliberately and with premeditation. *People v Dykhouse*, 418 Mich 488, 495; 345 NW2d 150 (1984).

The relevant statutory language has been codified for more than 150 years, and our Supreme Court has long settled the relevant understanding of the elements. In *People v Potter*, 5 Mich 1, 7 (1858), our Supreme Court explained that this statutory language showed that first-degree murder could not be proved with evidence of malice alone, but instead there must be proof that the killing was willful—that is done with the design to take the life of the victim. As for deliberation, our Supreme Court explained that a murder suddenly conceived after adequate provocation cannot properly be called deliberate. "But whenever murder is intentionally committed without serious provocation, and under circumstances which do not reasonably account for such an excitement of passion as naturally deprives men of deliberation, common experience teaches us that such an act is wanton, and its perpetrator responsible for it, as in other cases of cold-blooded crime." *People v Scott*, 6 Mich 287, 295 (1859). Whether an act was deliberate is a matter of plain common sense in which a "jury can seldom be at a loss to determine" because in most cases no "sane man acts without some cause for his action" and the jury will be able to determine whether it was a "sudden heat or not." *Id*.

Finally, this Court has discussed the proper distinction between deliberation and premeditation within the meaning of MCL 750.316:

> To premeditate is to think about beforehand; to deliberate is to measure and evaluate the major facets of a choice or problem. As a number of courts have pointed out, premeditation and deliberation characterize a thought process undisturbed by hot blood. While the minimum time necessary to exercise this process is incapable of exact determination, the interval between initial thought and ultimate action should be long enough to afford a reasonable man time to subject the nature of his response to a "second look." [*People v Morrin*, 31 Mich App 301, 329-330; 187 NW2d 434 (1971).]

Our Supreme Court subsequently endorsed this "second look" approach to determining the sufficiency of the evidence for premeditation and deliberation. See *People v Tilley*, 405 Mich 38; 273 NW2d 471 (1979). In *Tilley*, our Supreme Court agreed that, although a person who acts on sudden impulse cannot be said to have acted deliberately, the fact that there was a short span of time to deliberate and premeditate does not preclude a conviction of first-degree premeditated murder. *Id.* at 44-45. There need only be an interval between the initial thought and ultimate action sufficient to afford a reasonable person time to subject the nature of his or

-2-

her response to a second look. *Id.* at 45. If the defendant had such an opportunity, a reasonable jury could find that the defendant acted with deliberation and premeditation. *Id.* at 45-46.

In sum, a murder is committed willfully if the perpetrator intended to kill the victim, *Potter*, 5 Mich at 7, it is deliberate if done without adequate provocation—that is to say while undisturbed by hot blood, *Scott*, 6 Mich at 295; *Morrin*, 31 Mich App at 329-330, and it is premeditated if the perpetrator had the opportunity to consider his or her actions for some length of time before completing the murder, *Tilley*, 405 Mich at 44-46. In proving an actor's state of mind, the jury may rely on circumstantial evidence and the reasonable inferences arising from that evidence; indeed, minimal circumstantial evidence is sufficient to establish that a defendant had the intent to kill. *People v Unger*, 278 Mich App 210, 223; 749 NW2d 272 (2008).

Bogseth has not challenged the sufficiency of the evidence in support of a verdict of second-degree murder. Namely, he has not challenged the sufficiency of the evidence that he killed Kim and that he did so with malice. See *Roper*, 286 Mich App at 84 (stating that the elements of second-degree murder are a death, caused by an act of the defendant, with malice, and without justification or excuse). Instead, he maintains that there was insufficient evidence to demonstrate that he acted with premeditation and deliberation. Nevertheless, there was strong circumstantial evidence that Bogseth killed Kim and that he did so at some point after he picked her up from their home at around 10:40 a.m. on September 1, 2015, but before he was seen at work at around 12:30 p.m. later that same day.

There was evidence that Bogseth had recently discovered that Kim had had an affair with a neighbor, Larry Brink, with whom they were friends. Testimony established that Bogseth was the last person to see Kim alive on September 1, 2015, which was when he picked her up to take her to work. By his own admission, he fought with Kim during the drive. Although Bogseth claimed to have dropped Kim off near her work, she never made it there, and her body was discovered in the woods near their home on September 9, 2015.

It was undisputed that someone killed Kim by bludgeoning her to death. Although there was testimony that Kim could have died at the latest on September 6, 2015, there was testimony that the insect activity was consistent with her dying sometime before nightfall on September 3, 2015. There was also testimony that the insect activity would have been delayed if Kim's body were sealed from insects or if the odors given off by her remains were masked by some chemical. Additionally, there was evidence that Kim was killed at some other location, that she was stripped and wrapped in plastic bags, and that her body was then moved to the place where it was eventually found.

There was certainly evidence from which the jury could have found that Kim died long after Bogseth picked her up from their home on September 1, 2015, which would have made it less likely that he was the person who killed her. However, when reviewing the sufficiency of the evidence, this Court must be careful not to interfere with the jury's role in deciding the evidence. *People v Mehall*, 454 Mich 1, 6; 557 NW2d 110 (1997); see also *People v Lemmon*, 456 Mich 625, 646-647; 576 NW2d 129 (1998) (stating that when the question is "one of credibility posed by diametrically opposed versions of the events in question," courts must leave the test of credibility with the trier of fact). We must resolve all conflicts in the evidence in favor of the prosecution. *People v Wilkens*, 267 Mich App 728, 738; 705 NW2d 728 (2005).

Moreover, we must consider all the inferences that can be fairly drawn from the evidence when considering a challenge to the sufficiency of the evidence because, when evidence is relevant and admissible, "it does not matter that the evidence gives rise to multiple inferences or that an inference gives rise to further inferences." *People v Hardiman*, 466 Mich 417, 428; 646 NW2d 158 (2002). In such cases, it is for the fact-finder alone to "determine what inferences may be fairly drawn from the evidence and determine the weight to be accorded those inferences." *Id.*

A rational jury could conclude from the testimony about the state of Kim's remains that the person who killed her had to have taken some time to strip her, wrap her in plastic bags, and relocate the remains from the location of the murder to the wooded area where the remains were found. It could further infer that Kim's killer had to have performed these activities before the evening of September 3, 2015, which testimony established was the earliest point that the insect activity would have begun. The jury could then find that the insect activity did not occur because her remains were either sealed in some way or masked by chemicals after she was killed. Once the jury made the inference that the insect activity had been prevented in some way and that Kim's killer must have taken some time to cover up the crime and relocate her remains, it could conclude that she must have been killed earlier than the evening of September 3, 2015. It could also find that the start of the insect activity corresponded to the time when her remains were deposited in the woods, which also corresponded to the time period when Bogseth took the latter half of the day off from work.

The jury heard evidence that Kim abruptly and uncharacteristically ceased to participate in her normal activities by 11:38 a.m. on September 1, 2015. Her manager testified that Kim was a good employee who seemed to like her work and did not normally miss work. There was also testimony that she had been called in to work early and had made arrangements to be there, which suggested that she had no intent to miss work. Despite her plans and her work history, Kim failed to show up for work on September 1, 2015, and no one was able to contact her about her absence. Kim was also a heavy cell phone user, yet her cell phone ceased to send messages as of 11:38 a.m. on September 1, 2015. Laura Lee Adams testified that she was close to Kim and spent a significant amount of time with her. Adams said that Kim's last text message at 11:38 a.m. was uncharacteristic, and she suspected that a subsequent Facebook post purporting to be from Kim was not in fact from her given the flippant nature of the communication and the use of emoticons that Kim had never used before. Adams also testified that Kim was devoted to her son and would not have abandoned him. Kim had also expressed concern to Adams about the custody of her son now that she was going to divorce Bogseth, which was inconsistent with abandoning him in Bogseth's care. Brink too testified that Kim had been worried about what her friends thought of her and had stated her concern about preserving her friendship with Brink.

A reasonable jury considering this evidence could find that Kim failed to show up to work by around 11:00 a.m. and ceased communicating with her friends and family at around the same time because she was incapacitated. The jury could also infer from Adams's testimony that the last message that was sent from Kim's cell phone was made by someone other than Kim. When considered with the forensic evidence, the jury could reasonably find that Kim was already dead by the time the last text message was sent from her phone at 11:38 a.m. on September 1, 2015.

Jon Evans testified that he and his family lived in the same home as Bogseth and his family. He testified that Bogseth picked up Kim to take her to work at around 10:40 a.m. on September 1, 2015. Brink testified that he was communicating with Kim at that time, and she told him that Bogseth had arrived to take her to work. Additionally, Bogseth's employer testified that Bogseth texted him and stated that he needed to pick up his wife and take her to work at around the same time. Bogseth also admitted to officers on two separate occasions that he picked up his wife from their home at around 10:40 a.m. on September 1, 2015. Thus, there was evidence that Bogseth was the last person to be with Kim before her death, which the jury could have reasonably found occurred shortly thereafter.

There was also testimony and evidence that Bogseth had a fairly uncommon hammer that he routinely kept in his tool bag in his SUV, that that hammer was missing when his SUV and home were searched within a short time after Kim's disappearance, and that he might have taken a replacement hammer from his employer's tool shed. The evidence also showed that Kim was bludgeoned to death and that her injuries were consistent with the murder weapon being a claw hammer. Further, as already observed, there was evidence that Kim was a heavy cell phone user and that her cell phone was used to send an uncharacteristic text message to Adams at 11:38 a.m., but no more messages after that. There was also evidence that Bogseth called Adams at around that time and made statements to her that caused Adams to text Kim, which in turn set the stage for the uncharacteristic text. Officers later discovered Kim's phone in an envelope that arrived at Bogseth's home after Kim's disappearance. The envelope was found in a CD case that was similar to the one Kim usually brought to work and was seized from Bogseth's SUV.

A rational jury could find from this evidence that Bogseth took the phone and CD case from Kim around the time he picked her up to take her to work. It could also infer that he used her phone to send the uncharacteristic text message to Adams after he called Adams and that he did so to create a plausible explanation for Kim's disappearance. Adams's testimony that she had seen a Facebook message that was purportedly from Kim on September 2, 2015, but that she did not believe it to be from Kim, also fit this scheme. Adams stated that the message related that Kim had run off to California with a trucker on a whim—leaving behind her friends, her family, and her young son. Thus, there was evidence that Bogseth had taken Kim's phone and used it and other media to convey messages that would explain Kim's sudden disappearance and that he had done so by at least 11:38 a.m. on September 1, 2015. Those inferences gave rise to the inference that Bogseth was able to do so because Kim was already dead. See *Hardiman*, 466 Mich at 428.

There was also evidence that Bogseth took steps to conceal his involvement in Kim's disappearance and to cause the investigation to focus on Brink. Testimony established that the 61 text messages that had been sent between Kim's phone and Bogseth's phone on the morning of her disappearance had been deleted on both Bogseth's phone and Kim's phone. The fact that the same texts—and apparently only those texts—had been deleted from both phones, when considered with the evidence that Kim's phone was found concealed in Bogseth's SUV, gave rise to an inference that Bogseth deleted the text messages from both phones and that he did so to preclude anyone from discovering the content of the messages.

Jon Evans further testified that, on the evening after police officers searched Bogseth's home and found Kim's phone in Bogseth's SUV, someone matching Bogseth's description and wearing a similar shirt to the one he was wearing ran across the yard from the area of the trails toward Brink's home. Bogseth had been acting peculiarly after the police officers searched his home and then left for a time. He returned shortly after the person had been seen running through the yard behind his home. Sometime after he returned, Bogseth abruptly stated that he had found Kim's purse in Brink's yard. This testimony permitted an inference that Bogseth left on the evening after the police searched his home, retrieved Kim's purse, and placed it on Brink's lawn in an apparent attempt to focus the investigation on Brink. *Id.*

Considering all the circumstantial evidence together, including the evidence that Bogseth took steps to convince others that Kim had merely run off and that he likely planted Kim's purse on Brink's lawn, the jury could find beyond a reasonable doubt that Bogseth killed Kim and that he killed her with the hammer that he normally kept in his tool bag in his SUV at some point after he picked Kim up at around 10:40 a.m. but before he was seen at 12:30 p.m. on that same day. That is, there was evidence from which a rational jury could conclude beyond a reasonable doubt that Bogseth killed Kim within a short time after they drove away from their home. The remaining question is whether there was sufficient evidence from which a reasonable jury could infer that Bogseth acted willfully, deliberately, and with premeditation when he killed her. *Dykhouse*, 418 Mich at 495.

The evidence showed that Bogseth picked Kim up in his SUV and drove away with her. Bogseth told officers shortly after Kim's disappearance that he argued with Kim during the ride to her work and that she repeatedly insisted that he let her out. There was testimony that Kim's injuries were consistent with having been caused by a claw hammer like the one Bogseth kept in his tool bag in the back of his SUV. There was also testimony that her injuries would have resulted in significant blood loss. Yet officers did not find evidence consistent with such blood loss in Bogseth's SUV.

When viewed in the light most favorable to the prosecution, the testimony and evidence established that Kim had gotten out of the SUV at some point after Bogseth picked her up from home but before he attacked her with the hammer. Because the evidence showed that Bogseth kept a hammer in his tool bag in the back of the SUV, a jury could reasonably infer that Bogseth used the hammer that he had on hand to strike Kim. And it could reasonably find that he had to retrieve his hammer before he could do so. That is, a rational jury could find from the evidence that Bogseth had to both get out of the SUV and retrieve his hammer before he could strike Kim. He also had to move to the location where he struck Kim outside the SUV. Testimony established that Kim was hit in the back of the head and on the face with the hammer, and the examination of her remains did not reveal defensive wounds. From this, the jury could infer that Bogseth hit Kim from behind.

The evidence that Bogseth repeatedly struck Kim in the head with the hammer permits an inference that he intended to kill her—that is to say, that he willfully killed her. *People v Henderson*, 306 Mich App 1, 11; 854 NW2d 234 (2014). The evidence that he retrieved his hammer and moved to Kim's location outside the SUV before striking her is evidence that he acted with deliberation and not in the heat of the moment. Further, during the time that it would have taken to retrieve the hammer and approach Kim before striking her, Bogseth would have

had ample opportunity to consider his actions and take a second look before proceeding. See, e.g., *People v Johnson*, 460 Mich 720, 733; 597 NW2d 73 (1999) (recognizing that movement can be indicative of premeditation); *Tilley*, 405 Mich at 45 (recognizing that securing possession of a weapon and following the victim is evidence of premeditation and deliberation). Thus, there was ample time for Bogseth to deliberate and premeditate whether to kill Kim. *Morrin*, 31 Mich App at 330. Moreover, although the brutality of the attack on Kim was not evidence of premeditation and deliberation, *People v Hoffmeister*, 394 Mich 155, 159; 229 NW2d 305 (1975), the nature of the injuries to Kim's skull—both back and front—suggest that Bogseth would have had an opportunity to reflect on what he was doing before he ended her life, see *Johnson*, 466 Mich at 733.

When viewed in the light most favorable to the prosecution, the evidence permitted an inference that Bogseth stopped the SUV, retrieved his hammer from the back, moved to the location where Kim was after she left the SUV, and bludgeoned her to death. The choices implicit in these acts reflect deliberation and premeditation. The prosecution presented sufficient evidence to allow a rational jury to find beyond a reasonable doubt that Bogseth murdered Kim and that he did so willfully, deliberately, and with premeditation. *Dykhouse*, 418 Mich at 495; *Morrin*, 31 Mich App at 330.

## II. DEMONSTRATIVE EVIDENCE

### A. STANDARD OF REVIEW

Bogseth next argues that the trial court erred when it allowed the prosecutor to display a hammer before the jury that was purportedly like the one he owned. The trial court had the discretion to allow the admission of a demonstrative exhibit, *People v Castillo*, 230 Mich App 442, 444; 584 NW2d 606 (1998), or the use of a demonstrative aid, *Campbell v Menze Constr Co*, 15 Mich App 407, 409; 166 NW2d 624 (1968). This Court reviews a trial court's exercise of discretion for abuse. *People v Yost*, 278 Mich App 341, 353; 749 NW2d 753 (2008). A trial court abuses its discretion when it selects an outcome that falls outside the range of reasonable and principled outcomes. *Id.*

### B. ANALYSIS

This Court has held that a trial court may allow the admission of demonstrative evidence such as "physical objects alleged to be similar to those involved in the incident at issue." *Castillo*, 230 Mich App at 444. Such evidence may be admitted if it satisfies the "traditional requirements for relevance and probative value in light of policy considerations for advancing the administration of justice." *Id.* Trial courts may also allow the parties to use demonstrative aids during the presentation of their cases, such as blackboards, charts, and visual aids designed to help the jury understand the evidence. *Campbell*, 15 Mich App at 409. Whether to allow the use of a particular demonstrative aid, whether to mark the aid for the record, and whether to give an instruction concerning the aid are matters committed to the trial court's discretion. *Id.*

In this case, Bogseth argues that the trial court should not have allowed the prosecutor to admit the hammer as a demonstrative exhibit because the use of a physical hammer was not material to the case. Rather, it was merely a "dramatic prop designed to inflame and improperly

influence the jury." He also maintains that the trial court should have excluded the hammer under MRE 403.

The prosecutor used the hammer to clarify witness testimony and to provide the jury with a visual representation of the missing hammer, which is more akin to the use of demonstrative exhibit than a visual aid. Compare *Castillo*, 230 Mich App at 445-447 (discussing the trial court's decision to allow as a demonstrative exhibit a padlock similar to the one the defendant purportedly carried and may have used to commit the crime), with *Campbell*, 15 Mich App at 408-409 (discussing the use of a chart listing the damages that plaintiff alleged to have suffered as a visual aid). However, as the prosecutor correctly notes, the trial court did not admit the hammer into evidence. Indeed, it specifically instructed the jury that it could not consider the hammer as evidence but instead must limit its consideration to the actual evidence adduced at trial. The hammer, the court instructed, could be considered only as a demonstrative aid to understanding the testimony and evidence. Therefore, it cannot be said that the trial court erred by *admitting* the hammer into evidence. Instead, the question is whether the trial court abused its discretion to the extent that it allowed the prosecutor to use the hammer to clarify the two witnesses' testimonies and provide the jury with a demonstrative aid to understanding how that testimony fit with the other evidence.

Bogseth's employer testified that Bogseth regularly used his own tools while working as an independent contractor for his business. He stated that Bogseth kept his tools in a "black and blue canvas tool bag," and he identified the bag as the one depicted in photos taken by officers after Bogseth's SUV had been seized. His employer indicated that Bogseth also owned and used a claw hammer with a fairly distinct appearance: it was a "steel shaft, leather ring-stacked handle with some inlay on it."

Although claw hammers are common enough that the average juror would be able to visualize such a hammer, the distinctiveness of the hammer that Bogseth's employer described could not be adequately conveyed by oral testimony. His identification of a physical hammer of similar style presented the jury with a concrete representation of his oral description and allowed it to visualize the hammer's distinctiveness. This permitted the jury to better assess Bogseth's employer's credibility because it made it more likely than not that he would accurately recall seeing such a distinct hammer. See *People v Layher*, 464 Mich 756, 764-765; 631 NW2d 281 (2001) (recognizing that evidence implicating a witness's credibility is generally relevant). It also aided the jury in evaluating the testimony and evidence that tended to show that Bogseth no longer had that type of hammer after Kim's disappearance because a hammer with such characteristics would have stood out to the officer who searched Bogseth's SUV. Finally, a physical representation of the hammer allowed the jury to better assess the expert testimony that Kim's injuries could have been caused by a claw hammer. Claw hammers come in a variety of shapes, sizes, and weights. The employer's identification of the hammer presented by the prosecutor as being similar to the one he observed Bogseth using in his work gave the jury a concrete example of the size, shape, and weight of the hammer that Bogseth may have had available to him in his SUV, which better enabled the jury to assess the weight and credibility of the testimony tending to suggest that Bogseth used such a hammer to bludgeon Kim to death.

For all these reasons, the hammer would likely have been relevant and admissible as a demonstrative exhibit even though it was not the actual hammer at issue. See, e.g., MRE 401 (defining relevant evidence to be evidence having any tendency to make the existence of any fact of consequence more probable or less probable); MRE 402 (stating that relevant evidence is generally admissible); *Castillo*, 230 Mich App at 444. There is also no record evidence that the hammer actually used as a demonstrative aid had characteristics that made it improper to display to the jury or that the prosecutor displayed it or manipulated it in a way that unfairly prejudiced Bogseth. As such, even if it had been offered as an exhibit, it cannot be said to have caused unfair prejudice within the meaning of MRE 403.

Because the prosecutor's use of the hammer as a demonstrative aid helped the jury better understand the evidence, did not involve unfair prejudice, and there was no danger that the jury might misapprehend its status as an example rather than the actual item at issue, the trial court could have properly allowed the admission of the hammer as a demonstrative exhibit. Consequently, because the trial court could have permissibly allowed the admission of the hammer as an exhibit, the trial court's decision to allow the display of the hammer as a demonstrative aid without allowing the jury to consider it as evidence cannot be said to have fallen outside of the range of reasonable and principled decisions—at least with regard to Bogseth. Further, because the use of the hammer was not improper, Bogseth cannot demonstrate that defense counsel's failure to prevent the prosecutor's use amounted to ineffective assistance of counsel. *People v Gioglio (On Remand)*, 296 Mich App 12, 22-23; 815 NW2d 589 (2012), remanded for resentencing 493 Mich 864 (2012). Therefore, he has not shown that there was error warranting relief.

## III. STANDARD 4 BRIEF

Bogseth raises a number of additional arguments in a Standard 4 brief filed under Supreme Court Administrative Order No. 2004-6, Standard 4. He claims that the trial court erred when it allowed the admission of certain items of evidence. He also argues that his defense counsel was ineffective and that the prosecutor engaged in misconduct. We have examined each of these claims of error and conclude that none have any merit.

## A. ADMISSION OF EVIDENCE

Bogseth first argues that the extraction reports of the data taken from his cell phone and Kim's cell phone were inadmissible because the data was extracted before a warrant was issued to allow for the extraction. Bogseth asserts that Officer Gonyeau dated the extraction reports as having been done on September 10, 2015, at 0927 hours, and claims that the warrant to permit the extraction of the data did not issue until 11:57 a.m. on September 10, 2015. This Court reviews a trial court's decision to admit evidence for an abuse of discretion. *Roper*, 286 Mich App at 90. However, this Court reviews unpreserved claims of error for plain error affecting the defendant's substantial rights. *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999).

Bogseth does not have a legitimate expectation of privacy with regard to the data on Kim's phone. As such, he does not have standing to challenge the search of her phone. See *People v Mahdi*, 317 Mich App 446, 458-459; 894 NW2d 732 (2016). Additionally, Bogseth has the burden to establish the factual predicate for his claim of error, but he has not submitted

copies of the relevant reports or the warrant at issue. For that reason, he has not established that Officer Gonyeau actually extracted the data before he had been authorized to do so by the warrant. Even if Officer Gonyeau had extracted the data before the magistrate issued the warrant, Bogseth has not shown that Officer Gonyeau would not have sought or obtained the warrant absent evidence obtained through the illegal search. Indeed, there was testimony at the probable cause hearing that the phones were seized during the search of Bogseth's home to allow for the downloading of the information on them. Had Bogseth timely objected to the extraction reports, the prosecutor may have established that they were admissible under the independent source doctrine. See generally *People v Smith*, 191 Mich App 644, 649-650; 478 NW2d 741 (1991).

Bogseth also argues that Officer Gonyeau engaged in some impropriety involving the phone records for the two cell phones because there is a letter from the cell phone provider that was dated September 6, 2015, which was before the September 9, 2015, date of the search warrant for the cell phone data. He has again failed to attach any of the relevant records. Bogseth also alleges that Officer Gonyeau engaged in some impropriety by asserting that he reviewed the phone records in his report even though the prosecutor still had not obtained certified copies of those records as of the hearing held on June 3, 2016. At the hearing the prosecutor stated that he already had the records at issue, but he had not yet received certified copies. Therefore, it is not clear that Officer Gonyeau could not have had the cell phone carrier's records at the time he prepared his reports, and it is not clear that he obtained those reports without a warrant.

Bogseth also maintains that the trial court erred when it allowed the admission of the reports prepared by the officer, Katherine Merideth, who tested the DNA found on the can of tire inflator seized from Bogseth's SUV. He maintains that Merideth's testimony established that she received the tire inflator can on September 11, 2015, which was before the officers obtained a search warrant to search his SUV after his arrest. Meredith did testify that the container for that evidence listed a date of September 11, 2015. However, she explained that "the date received" listed on the containers refers to the date she started her assignment and not the date that the item to be tested actually arrived at the lab. Consequently, Bogseth has not shown that officers actually seized the can of tire inflator before obtaining a search warrant. There was no plain error. *Id.*

## B. INEFFECTIVE ASSISTANCE

"To establish a claim of ineffective assistance of counsel, the defendant must show that 'counsel's representation fell below an objective standard of reasonableness' under prevailing professional norms and that there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Gioglio*, 296 Mich App at 22, quoting *Strickland v Washington*, 466 US 668, 688, 694; 104 St Ct 2052; 80 L Ed 2d 674 (1984).

Bogseth first argues that his lawyer's failure to file a notice of alibi was unreasonable and prejudiced his trial. He does not, however, identify the alibi evidence that would have established that he could not have committed the murder. Thus, he failed to establish the factual predicate for this claim. *People v Carbin*, 463 Mich 590, 600; 623 NW2d 884 (2001). Bogseth

also argues that his lawyer should have called a witness who purportedly saw Kim alive at a rest stop on September 3, 2015; should have called Adams's husband who allegedly said to Adams, "You killed Kimmy, you killed your best friend"; and should have called Bogseth's private investigator to testify about his findings. But, as with his alibi claim, Bogseth has not offered any meaningful analysis of the law or facts, nor has he presented any evidence that these witnesses would have testified favorably to his defense. By failing to establish the factual predicate for this claim of error, Bogseth failed to establish that his lawyer's decision to refrain from calling these witnesses fell below an objective standard of reasonableness. *Id.*

Bogseth also faults his lawyer for not taking steps to secure the admission of posts that Adams made to Facebook, which he claims would establish reasonable doubt about whether Bogseth murdered Kim. He also argues that his lawyer should have done more to obtain the admission of the photo of Adams's vehicles. He states that one of the vehicles shown in the photo appears on the security footage from Walmart. The record reflects that Bogseth's lawyer attempted to admit the evidence of Adams's posts to Facebook around the time of Kim's disappearance and the photo of Adams's cars, but the trial court excluded the evidence because Bogseth's lawyer failed to timely disclose the evidence and could not offer a proper foundation for admitting the documents or photos. Nevertheless, even if Bogseth's lawyer's handling of this evidence could be said to have fallen below an objective standard of reasonableness under prevailing professional norms, Bogseth has not shown that his lawyer's conduct prejudiced his trial. *Gioglio*, 296 Mich App at 22.

Adams testified about the media posts and photo outside the presence of the jury. She explained that her posts were an angry response prompted by her belief that Kim had run off with a trucker. The evidence that she was responding angrily to what she then believed and that she came to those beliefs as a result of posts that did not appear to have been sent by Kim gave rise to an inference that she did not have anything to do with Kim's disappearance. Indeed, the evidence suggested that she had been duped. Likewise, Adams testified that she was upset with Kim at the time because she had been led to believe that Kim abandoned her family. She explained that she came to that conclusion after a Facebook post on Kim's Facebook page. She testified further that she did not think the post was by Kim. As such, the proposed evidence would not have furthered Bogseth's defense and may in fact have favored the prosecution's theory that Bogseth was trying to cover up Kim's murder by September 2, 2015. On this record, Bogseth has not shown that his lawyer's failure to admit this evidence prejudiced his trial. *Gioglio*, 296 Mich App at 22.

Adams similarly stated that she owned lots of vehicles, and there was no indication that the Walmart footage could have conclusively established that Adams's car was at the Walmart parking lot when a witness claimed to have seen someone who looked like Kim. Bogseth's lawyer apparently felt that the black car depicted in the photo looked similar to a black car in the Walmart parking lot. Adams, however, stated that the car in the picture from her home was used in Chicago 95% of the time. Therefore, even if Bogseth's lawyer's handling of this evidence could be said to have fallen below an objective standard of reasonableness under prevailing professional norms, any error did not prejudice Bogseth's trial. *Id.*

Bogseth also suggests that the prosecutor committed discovery violations and he impliedly faults his lawyer for failing to address the violations. He claims—without any evidence in support—that the prosecutor failed to provide him with the requested copies of the criminal records for Brink and Jon Evans, failed to provide all the photographs from the scene where Kim's remains were recovered, and failed to provide the recordings from Brink's 9-1-1 call on the day he discovered Kim's remains. In the absence of evidence that the prosecutor actually committed any discovery violations, this Court has no basis to conclude that Bogseth's lawyer's failure to address those violations amounted to ineffective assistance. *Carbin*, 463 Mich at 600.

Finally, Bogseth argues that his lawyer's failure to challenge his allegedly illegal arrest and extradition from Illinois amounted to ineffective assistance. Even assuming that his arrest and extradition were unlawful, Bogseth has not established a right to relief. Our Supreme Court has explained that "a court's jurisdiction to try an accused person cannot be challenged on the ground that physical custody of the accused was obtained in an unlawful manner." *People v Burrill*, 391 Mich 124, 133; 214 NW2d 823 (1974). Rather, due process is satisfied when the accused has been convicted after having been fairly apprised of the charges against him or her and after having had a fair trial in accord with constitutional procedural safeguards. *Id.* Because Bogseth has not shown that he did not receive a fair trial, he is not entitled to any relief.

## C. PROSECUTORIAL MISCONDUCT

Bogseth argues that the prosecutor failed to disclose certain items during discovery. Specifically, he maintains that the prosecutor failed to turn over all the photos taking during the recovery of Kim's remains, failed to turn over the recordings of the 9-1-1 calls from the day Kim's remains were found, failed to disclose the criminal records for Brinks and Jon Evans, and failed to ensure that the police officers' field notes were preserved. However, on appeal, Bogseth has not provided any evidence that the prosecutor actually failed to disclose or provide evidence in discovery that Bogseth requested and over which the prosecutor had control. Instead, the record reflects that the prosecutor complied with every discovery request.[2]

Bogseth next argues that the prosecutor had an obligation to correct a witness's false testimony. Bogseth maintains that cell phone records showed that he was not in the witness's vicinity on the day that she claimed he asked her to call the police department and pretend to be Kim, so the prosecutor had to have known that the testimony was false. It is well settled that a prosecutor violates a defendant's right to due process of law when he or she obtains a conviction

---

[2] Bogseth's lawyer did state that they were awaiting copies of the officers' field notes that were used to prepare the police reports and some additional photos that may have been referred to in various reports. However, the prosecutor informed the court that the field notes were destroyed as a matter of routine practice once the report has been prepared and reviewed to ensure that the report comported with the notes. The loss of evidence before a discovery request—such as the field notes used to prepare the reports—will not warrant relief absent proof of intentional suppression or bad faith. See *People v Jones*, 301 Mich App 566, 580; 837 NW2d 7 (2015). Here, there is no evidence of an intentional suppression or bad faith.

through the knowing use of perjured testimony. *People v Aceval*, 282 Mich App 379, 389; 764 NW2d 285 (2009). When the prosecutor knows that a witness has testified falsely, the prosecutor has an affirmative duty to correct the testimony. *People v Smith*, 498 Mich 466, 476; 870 NW2d 299 (2015). However, even assuming that there was cell phone evidence to support Bogseth's claim, that evidence would not establish that the witness was lying or even mistaken about the timing of the request. A prosecutor is under no obligation to disbelieve his or her own witness's testimony in the face of contradictory testimony or statements. See *People v Lester*, 232 Mich App 262, 278-279; 591 NW2d 267 (1998), overruled on other grounds *People v Chenault*, 495 Mich 142; 845 NW2d 731 (2014).

Finally, Bogseth argues that the prosecutor engaged in numerous instances of misconduct during his closing statements. He claims that the prosecutor mischaracterized the testimony and evidence and essentially testified as a witness. A prosecutor may not argue facts not in evidence or mischaracterize the evidence during his or her closing statement. See *Unger*, 278 Mich App at 241. The prosecutor may, however, argue the evidence and all reasonable inferences as it relates to his or her case. *People v Bahoda*, 448 Mich 261, 282; 531 NW2d 659 (1995).

Bogseth argues that it was improper for the prosecutor to argue that Kim died someplace other than where her remains were recovered and that her remains must have been transported to that location from where she died. Contrary to Bogseth's contention, there was evidence that Kim must have died somewhere else. Bogseth also complains that the prosecutor improperly submitted a Powerpoint presentation at trial that was made using cell phone records that had not been certified. He asserts that the prosecutor then compounded his error by using the presentation to argue that Bogseth fled from the area when Kim's remains were found. The Powerpoint presentation was made using the cell phone records that officers obtained from Bogseth's cell phone provider. Although Bogseth implies that the presentation was created using the uncertified records, he has not established that fact and, in any event, does not show how the uncertified records differed from the certified records. Assuming that the records were identical, Bogseth has not shown that the presentation was inherently inadmissible. And the prosecutor's good faith attempt to seek the admission of the Powerpoint presentation does not amount to prosecutorial misconduct. See *People v Dobek*, 274 Mich App 58, 71; 732 NW2d 546 (2007). There was also testimony that Bogseth sped away from the area at around the time Kim's remains were found near his house, and the cell phone records showed that he made the trip to Chicago relatively quickly. The prosecutor could argue from the totality of the evidence that Bogseth had in fact "hightailed" it to Chicago and that his actions were evidence of a guilty conscience. See *People v Coleman*, 210 Mich App 1, 4; 532 NW2d 885 (1995) (stating that evidence of flight is admissible to prove consciousness of guilt).

Bogseth also argues that the prosecutor improperly admitted the notebook with his handwritten notations about the timing of events on September 1, 2015. The prosecutor presented evidence that the notebook was found in Bogseth's bathroom and was written in his handwriting. As such it was relevant and admissible. MRE 401; MRE 402. And the prosecutor was free to argue any inference that might be drawn from it, which included an inference that Bogseth was trying to fix his story for the officers who were investigating his wife's disappearance.

Bogseth also believes that the prosecutor could not argue that Kim's remains did not show any signs of classic defensive wounds. However, there was testimony to that effect. The fact that there was evidence that she might have suffered some injuries before death that were consistent with defensive wounds did not make it improper for the prosecutor to argue that she did not suffer defensive wounds and suggest that this was because she was struck from behind. Similarly, the fact that the expert could not definitively state that Kim was bludgeoned to death with a claw hammer did not alter the fact that the expert testified that her injuries were entirely consistent with deaths known to have been caused by claw hammers.

Next, Bogseth makes much of the fact that an officer stated that Kim's cell phone sent or received data after the last text. However, the fact that the cell phone continued to connect to the cell network was not the same as actively sending texts. And the prosecutor could properly argue that the last message sent from Kim's phone was the message actually identified as the last message by the expert who analyzed her phone.

Bogseth further contends that it was improper for the prosecutor to argue that Kim's remains had been treated with some chemical to mask the odor of decomposition. Given the evidence that Kim likely died on September 1, 2015, the prosecutor could reasonably argue that the fact that there had been no insect activity before September 3, 2015, was because Bogseth used some chemical to mask her odor. Contrary to Bogseth's contention on appeal, there was no testimony that Kim's remains had not been treated with some chemical. Instead, the expert explained that such a chemical had not been detected but likely could not be detected given the level of decay.

Bogseth also contends that the prosecutor was merely speculating when he opined that Bogseth might have killed Kim because he was concerned about retaining custody of their child. Adams testified that Kim was concerned about custody before her disappearance. She also testified that Bogseth sought legal help, and she indicated he did so because he feared that Kim might kidnap the child. Therefore, the prosecutor could properly argue that there was evidence that Bogseth might have been motivated to kill Kim to ensure that he obtained custody.

Bogseth next finds fault with the prosecutor's argument that the person Jon Evans saw running outside the home on the night that Bogseth found Kim's purse was in fact Bogseth. Jon testified that the man he saw was wearing a green shirt like the one Bogseth was wearing earlier. He also agreed that the person had the same height and build as Bogseth. Thus, there is evidentiary support for the prosecutor's argument.

Finally, Bogseth argues that the prosecutor built his case using inference upon inference, which, he claims, was improper. Bogseth relies on the decision in *People v Atley*, 392 Mich 298; 220 NW2d 465 (1974). However, our Supreme Court specifically overruled *Atley* in *Hardiman* and held that a case may be made using inferences premised upon inferences. *Hardiman*, 466 Mich at 428.

## IV. CONCLUSION

The prosecutor presented sufficient evidence from which a rational jury could find beyond a reasonable doubt that he killed Kim and that his acts were willful, deliberate, and premeditated. As such, there was sufficient evidence to support his conviction of first-degree premeditated murder. Bogseth has also failed to establish that the prosecutor's use of the hammer as a demonstrative aid was improper. Finally, having carefully examined each of the claims of error raised in Bogseth's Standard 4 brief, we conclude that none have any merit. Because Bogseth has not identified any errors that warrant relief, we affirm his conviction.

Affirmed.

/s/ Jane E. Markey
/s/ Michael J. Kelly
/s/ Thomas C. Cameron