*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellant,

v

JASON DIAZ,

      Defendant-Appellee.

UNPUBLISHED
April 13, 2023

No. 359949
Ionia Circuit Court
LC No. 2021-018262-FH

Before: SHAPIRO, P.J., and LETICA and FEENEY, JJ.

PER CURIAM.

The prosecution appeals as of right the circuit court's order dismissing the charges of assault with intent to do great bodily harm, MCL 750.84, misconduct in office, MCL 750.505, and careless discharge of a firearm causing injury or death, MCL 752.861. We affirm.

## I. BASIC FACTS AND PROCEDURAL HISTORY

This case arises from a high-speed chase that resulted in defendant firing his weapon at a fleeing vehicle. At approximately 2:02 a.m. on August 29, 2020, defendant, a Lowell Police Department Officer, was on duty performing road patrol in Lowell, Michigan. Defendant passed a Chevrolet Impala that failed to dim its headlights,[1] and defendant, in a marked police cruiser, turned around and followed the car.[2] Defendant saw that the Impala did not have a license plate. He advised the dispatcher that the number of occupants in the vehicle was unknown. The driver of the Impala increased the speed and fled from defendant through downtown Lowell. Defendant

---

[1] See MCL 257.700.

[2] Defendant did not testify at the preliminary examination. Therefore, we cannot conclude that defendant turned and followed the Impala with the intention of conducting a traffic stop or if the lack of a license plate caused him to initiate the stop. In this opinion, any statements attributed to defendant were recorded on his body camera that was admitted at the preliminary examination.

activated the cruiser's overhead emergency lights and began to chase the Impala, reaching a speed of 106 miles per hour (mph).

The driver of the Impala then turned left onto an unlit, dirt road in order to evade defendant. The chase continued along this road until the Impala stopped in front of a large tree that had fallen and blocked the roadway. Defendant parked behind the Impala, got out of his cruiser, stood by the cruiser's driver-side door, and verbally commanded the driver of the Impala to, "Let me see your hands!" The driver did not comply with defendant's demand. Instead, the driver reversed the Impala and accelerated backward directly toward defendant and his parked cruiser.[3] To avoid being crushed by the Impala, defendant quickly jumped back into the cruiser. The reversing Impala then collided with the police cruiser. The Impala caused damage to the police cruiser, including the removal of its driver's side-view mirror.

From the driver's seat of the cruiser, defendant fired three rounds with his weapon at the Impala while it was reversing. After the Impala collided with the cruiser, the Impala began to pull away and attempted to flee the scene. Defendant again left his cruiser. He attempted to fire his weapon but two misfires occurred. Defendant corrected his weapon and fired eight additional rounds at the Impala, seemingly to stop the vehicle from fleeing.[4] In less than 20 seconds, defendant parked his cruiser, the driver failed to abide by defendant's command, the driver attempted to strike defendant with the Impala, defendant fired shots at the Impala, and the driver fled the scene in the Impala.

Defendant notified the dispatcher that the driver of the Impala attempted to run him over and that shots had been fired.[5] In response, the dispatcher requested that all available units proceed to Lowell because shots were fired. Initially, defendant expressed that he may not be able to continue the pursuit because of a possibly flat tire. Defendant was able to drive to the end of the dirt road and notified the dispatcher that the driver of the Impala seemingly proceeded west on Fulton Road. When defendant drove his police cruiser further down the road, he found the Impala off the road in a ditch with multiple doors open. There were no occupants present at the scene, and blood appeared to be in the Impala. At the scene, defendant encountered Grand Rapids Police Officer Zuby who was traveling home at the time in a marked police vehicle. Defendant apprised Officer Zuby that he was unaware if the occupants had weapons, but they attempted to "take" him out. Officer Zuby responded that he had to swerve off the roadway to avoid a nearly head-on

---

[3] In light of the video recording from the police cruiser, it appeared that the cruiser was in the center of the roadway behind the Impala. The driver of the Impala did not reverse along the passenger side of the cruiser but choose the route where defendant was standing.

[4] We note that the prosecution does not take issue with defendant firing the first three rounds at the Impala as it reversed toward defendant. On appeal, the prosecution submits that the eight additional rounds fired at the Impala after it collided with the police cruiser and fled served as the grounds for the charges.

[5] Defendant's body camera recorded defendant stating that shots were fired and that the driver "tried to take me out with the vehicle."

collision with the Impala. Defendant requested a K-9 unit come to the scene to locate the Impala's occupants and called his police chief to report the officer involved shooting.

Willie Bledsoe testified that the driver of the Impala picked him up around midnight in Grand Rapids, and the occupants were headed to Lansing.[6] During the chase, Bledsoe asked the driver to pull over on multiple occasions but the driver did not do so. Bledsoe acknowledged that the driver had attempted to escape both before and after defendant fired his weapon at the Impala. After the Impala was stopped by the fallen tree, Bledsoe did not see defendant because he had his head down. Bledsoe denied hearing defendant speak or seeing him get out of the police cruiser. Bledsoe testified that he did not hear any gunshots until "we started driving off." Additionally, he did not see any bullets but observed "glass flyin' everywhere." Bledsoe stated that he "got shot at" and felt a "little weird vibration" on the back of his head, but "it wasn't like anything major." Bledsoe later realized that the hoodie he was wearing during the incident had a bullet hole in it. After the incident, Bledsoe was taken to the hospital and treated for "injuries on [his] head."

The prosecution charged defendant with assault with intent to do great bodily harm, misconduct in office,[7] and careless discharge of a weapon causing injury or death. The district court bound defendant over on all three charges, noting that the burden of proof only required that probable cause be established, not proof beyond a reasonable doubt. It further determined that the driver of the Impala committed fleeing and eluding in trying to resist an arrest. The district court stated that if the trier of fact found that the amount of force defendant utilized exceeded that which is legal, it could conclude that misconduct in office and careless discharge of a weapon occurred.

---

[6] There were conflicts in Bledsoe's testimony. Initially, he indicated that there were six other people in the car, yet he only identified five others. He identified the driver as "Mike Mike," and two individuals in the front passenger seat as "Cello" and "Tatiana." Bledsoe testified that he was in the middle of the backseat with "Collin" seated to his left and "J.C." seated to his right. Initially, Bledsoe testified that he was asleep in the backseat of the Impala until the driver turned on the dirt road. Additionally, Bledsoe did not detect the driver traveling at speeds in excess of 100 mph. However, he later stated that he woke up when the other occupants discussed how defendant turned his police cruiser around and drove behind them but had not yet activated his overhead lights. Bledsoe testified that the vehicle occupants were found "a couple minutes or so later," after the Impala crashed, but on cross-examination, acknowledged that they hid for 1½ hours in a car on someone's property. Bledsoe denied that he hid because he had engaged in any wrongdoing. But, after the bindover to circuit court, the prosecutor moved to exclude evidence that the Impala was stolen, that it contained stolen property, and any criminal charges or convictions pertaining to or underlying the police chase. Further, the prosecutor moved to exclude Bledsoe's criminal convictions and juvenile adjudications as well as criminal activity pertaining to the other occupants.

[7] The prosecution was unable to admit the Lowell Police Department's policy and procedures during the proofs at the preliminary examination. At the bindover stage, it orally moved to amend the misconduct in office charge to reflect firing at a moving vehicle.

Defendant then filed a motion to dismiss the charges against him, alleging that, as a law enforcement officer, defendant was justified, under the fleeing-felon rule, in firing his weapon at the Impala to stop the driver from fleeing. The prosecution responded[8] that the reasonableness of defendant's use of force was a question reserved for the trier of fact.

At the motion hearing, defendant again asserted that his use of deadly force (firing his weapon at the fleeing Impala) was justified because the driver of the Impala was a fleeing-felon who posed an ongoing danger to the community. Additionally, defendant maintained that the reasonableness of defendant's actions was a matter of law for the circuit court to decide. The prosecution responded that the issue of whether defendant's actions were justified was a question that must be resolved by the trier of fact. And the prosecution argued that there was no Michigan caselaw that prohibits the criminal prosecution of police officers who used deadly force against nondangerous fleeing felons.

The circuit court determined that the issue was a question of law and that the issue should be viewed through the reasonable-officer standard. The circuit court concluded that the driver of the Impala was a fleeing-felon, that defendant was forced to avoid being injured by the Impala (a dangerous weapon), and that the driver presented an ongoing danger to the community. After noting that the driver of the Impala attempted to run defendant over with the car, it stated:

> This wasn't a near miss of just somebody who was trying to get away. This was actually hitting the police officer – the vehicle – to the point that he was out of the vehicle, as I understood the facts, and had to jump back to avoid being hit himself.
>
> So the other aspect that I think is very critical here, in the overall assessment of the situation, is that the fleeing felon, so to speak, was with a dangerous weapon. And we know that the law is clear and settled that vehicles can be a dangerous weapon.
>
> The fact that [the driver] was willing to – clearly, he was trying to get away. And I think that the passenger in his car say, you know, just, basically, that the driver was trying to get away, but the fact that he was willing to actually hit a police cruiser, and then continue off, I think, is really indicative of the fact that we have, not just an unarmed fleeing, we have a dangerous felon who is leaving in the midst

---

[8] In the response brief, the prosecution alleged that defendant's motion contained a statement of facts "very generous to himself" that relied on information and evidence not found in the record. However, the prosecution's response brief stated that the driver of the Impala "reversed, backing up toward and around the patrol car." The brief failed to mention that the driver struck the police cruiser and that defendant had to jump into the cruiser to avoid being hit. The circuit court stated that it was not provided the police cruiser and police officer body camera recordings and had to find a video clip online. The circuit court expressed its disappointment that the prosecution's recitation of the facts did not mention that the Impala struck the police cruiser.

of a high-charged situation, and [defendant] had to make decisions in a split-second type of a situation.

And I find that the facts and circumstances of this particular case, which is then augmented by the fact that, not only did this fleeing felon with a dangerous weapon go about continuing to flee, but the fact that there was an off-duty officer who had to actually take evasive action, in the middle of the night, to avoid being hit, I think is indicative of the fact that this truly was a dangerous fleeing felon . . . .

And so I don't find this to be an issue of fact for a jury, because we're looking at it through the lens of a reasonable police officer. And I think that that is better, I guess, a determination by a reviewing court, in terms of making it a matter of law.

But again, I do really tailor this finding to the specific circumstances of this particular case, recognizing that the officer was – his vehicle was hit, that he would have been hit had he not moved, and the fact that this fleeing felon was continuing in a very reckless and dangerous manner with a dangerous weapon.

So for these reasons, I do find that [defendant] was justified, when we look at it from the circumstances at that particular time and not going back with hindsight later.

Accordingly, the circuit court granted defendant's motion and dismissed the charges.

## II. STANDARD OF REVIEW

We review a trial court's decision to grant or deny a motion to dismiss charges against a defendant for an abuse of discretion. *People v Ali*, 328 Mich App 538, 542-543; 938 NW2d 783 (2019). An abuse of discretion occurs when the trial court's decision falls outside the range of reasonable and principled outcomes. *People v Montague*, 338 Mich App 29, 37; 979 NW2d 406 (2021). The application of a legal doctrine to the request for dismissal is reviewed de novo. See *Ali*, 328 Mich App at 542. Application of a principle of law to uncontested facts is reviewed de novo. See *People v Stevens (After Remand)*, 460 Mich 626, 631; 597 NW2d 53 (1999).

## III. MOTION TO DISMISS

The prosecution submits that the circuit court erred by granting defendant's motion to dismiss. We disagree.

Police officers work in an environment of criminal activity where each decision is fraught with uncertainty. *Norris v Lincoln Park Police Officers*, 292 Mich App 574, 579; 808 NW2d 578 (2011). Police officers are entitled or justified in engaging in actions for their own protection. *People v Otto*, 91 Mich App 444, 451; 284 NW2d 273 (1979).

Certainly, it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties. American criminals have a long tradition of armed violence, and every year in this country many law

-5-

enforcement officers are killed in the line of duty, and thousands more are wounded. [*Id*. at 451-452 quoting *Terry v Ohio*, 392 US 1, 23-24; 88 S Ct 1868; 20 L Ed 2d 889 (1968).]

There is an inordinate risk to a police officer as he approaches an individual seated in a vehicle. *Pennsylvania v Mimms*, 434 US 106; 98 S Ct 330; 54 L Ed 2d 331 (1977). A significant percentage of murders of police officers occur during the course of an officer making a traffic stop. *Id*. In *People v Whitty*, 96 Mich App 403, 411-412; 292 NW2d 214 (1979), this Court addressed the arrest of a felon and its application to private citizens and police officers:

Under the common law, the use of deadly force in making an arrest can be divided into two categories; the use of deadly force when the person making the arrest is met with force from the person who is to be arrested, and the use of deadly force when necessary to prevent the person who is to be arrested from fleeing. The first is generally analyzed under principles of self-defense, although there may be differences such as forgoing the necessity of retreat. The second is more problematic, and has sparked the most controversy. It also appears that the common law imposed a further distinction between police officers and private persons when the matter escalated beyond the issue of making the arrest to the question of when deadly force could be used to make the arrest. While a private citizen could arrest a person who was *suspected* of committing a felony that *in fact* occurred, deadly force was justified only if the felony actually occurred and the person against whom the force was used was in fact the person who committed the felony. A police officer was justified in acting on the basis of reasonable belief at both levels of inquiry. [citations omitted, emphasis in original.]

Thus, the use of force may be necessary to effectuate an arrest, and the use of deadly force may be "necessary to stop a felon from fleeing." *Id*. at 412.

The prosecution of a police officer as a criminal defendant is not prohibited by the fleeing-felon rule. In *People v Fiedler*, 194 Mich App 682, 684; 487 NW2d 831 (1992), the circuit court quashed the information charging the defendant police officer with involuntary manslaughter, in relevant part, premised on the fleeing-felon rule. The Benton Harbor Police Department received an anonymous tip that Terry Jenkins, an individual wanted on a charge of open murder, had been spotted in the vicinity of 700 Pavone Street. Jenkins was described as wearing a brown brimmed hat, black sweatpants, white tennis shoes, a blue denim jacket with a fur collar, and braids in his hair. No information was given regarding Jenkins' height, weight, or complexion. The defendant received the information about the anonymous tip and proceeded to Pavone Street. *Id*. at 684-685.

Marie Kimble was watching television in her upstairs apartment at 755 Pavone Street when acquaintance Sam Buchanan arrived with Norris Maben, a man she did not know  Maben was wearing a blue brimmed hat, two coats, one blue and one black, blue sweatpants, and blue tennis shoes. Kimble allowed the defendant into her apartment after he knocked on her door. The defendant first encountered Buchanan and asked for identification. Maben was in an adjoining room outside the view of the defendant and told Kimble, "You ain't seen me," but she advised that she would not hide anyone. Maben entered the kitchen where the defendant was standing, advised that he did not have any identification, and said his name was, "Norris Maben." As the defendant

-6-

extended his hand toward Maben, Maben fled the kitchen into the living room and back bedroom before jumping outside through the glass of a closed window. The defendant followed Maben's path through the apartment, yelled "halt" three times, and then three rapid gunshots were fired. Kimble saw Maben lying face down on the ground in the backyard. Kimble testified that the defendant never told the apartment occupants why he was there, never mentioned who he was looking for, never arrested or charged anyone with a crime, and never drew his handgun in her presence. *Id*. at 685-686.

The defendant called a deputy sheriff to testify to whom the defendant gave a statement. The defendant stated that he saw two men on the porch of 755 Pavone Street, and one of the men matched the description of Jenkins because he was wearing a small-brim hat and dark clothing. When he knocked on the door, the defendant encountered a small child and asked about the men. The child told the defendant that the men went to the upstairs apartment. Once there, the defendant encountered a woman who said that no one else was present. The defendant noted that the child downstairs stated otherwise when a man stepped forward and indicated that he was the only man there. The defendant asked for the man in the small-brimmed hat when Maben stepped forward into the room. Maben said his name and denied having any identification. When the defendant reached for Maben's coat pocket to locate a wallet, Maben pushed the defendant, fled from the room, and dove out the window. The defendant stood at the window and ordered Maben to halt. The defendant observed Maben turn and move as if reaching to his hip for something, and the defendant drew his handgun and fired three shots, believing that Maben was, in fact, Jenkins, and that he was reaching for a weapon. *Id*. at 686-687. The circuit court, in part, granted the motion to quash, citing the fleeing-felon rule. *Id*. at 686.

On appeal, this Court reversed the circuit court's application of the fleeing-felon ruling. After acknowledging the *Whitty* decision and the fleeing-felon rule, *id*. at 693-694, the *Fiedler* Court determined that a factual issue was presented because of conflicts in the evidence, stating:

> In determining that [the] defendant's killing of Maben was justified under the common-law fleeing-felon rule, the circuit court found that [the] defendant reasonably believed that Maben was Jenkins and that [the] defendant was justified in using deadly force against Mabel. In so doing, the circuit court resolved conflicts in the testimony and substituted its judgment for that of the district court. Whether [the] defendant was justified in believing that Maben was Jenkins and in using deadly force against Maben is a question for the trier of fact. Accordingly, we hold that the circuit court erred in granting [the] defendant's motion to quash the information. Considering the evidence presented at the preliminary examination, the district court did not abuse its discretion in binding over [the] defendant for trial. [*Id*. at 694.]

In light of the *Fiedler* decision, the prosecution submits that the circuit court erred in granting defendant's motion to dismiss because the application of the fleeing-felon rule always

presents a factual issue that must be resolved by the jury.[9] But, we have concluded that the application of a legal doctrine to the request for dismissal is reviewed de novo. See *Ali*, 328 Mich App at 542. And, the application of a proposition of law to uncontested facts is reviewed de novo. See *Stevens (Aft Rem)*, 460 Mich at 631. In the present case, the police chase was captured on video recordings. In less than seven minutes, the driver of the Impala fled from defendant through the downtown streets of Lowell at approximately 2:00 a.m. During the chase, defendant's police cruiser reached speeds of 106 mph but still did not come in close proximity to the Impala. The Impala driver's decision to turn down an unlit dirt road and the fallen tree allowed defendant to close the gap between the vehicles and pull up behind the Impala. Defendant stood outside his police cruiser with his weapon displayed and demanded to see the driver's hands. The driver of the Impala did not comply but choose to back up the Impala in the location where defendant stood. Defendant was forced to jump into his police cruiser to avoid being struck and fired shots into the Impala. The prosecution does not take issue with defendant's conduct at that time. However, after the Impala passed the police cruiser, defendant jumped back from his cruiser and attempted to fire his weapon. At that time, the Impala was still in proximity to defendant and could have attempted to ram the cruiser or defendant himself. Defendant corrected his weapon and fired eight additional shots at the vehicle. However, the driver of the Impala did not drive forward to further disable defendant or the police cruiser and took off at a high rate of speed. As the Impala sped away, the driver encountered Grand Rapids Police Officer Zuby in a marked police vehicle. Officer Zuby noted that he was forced to leave the roadway to avoid being involved in a head-on collision with the Impala.

The undisputed evidence established that the driver of the Impala took defendant on a high speed chase through downtown Lowell, when stopped by a fallen tree he failed to surrender, he reversed the Impala into the police cruiser where defendant stood, he hit the police cruiser and caused defendant to jump in to avoid being struck, and then proceeded to flee the scene and nearly caused injury to another police officer through a head-on collision.[10] The use of force may be necessary to effectuate an arrest, and the use of deadly force may be "necessary to stop a felon from fleeing." *Whitty*, 96 Mich App at 412. A police officer may justifiably use deadly force when he has a reasonable belief that a felony actually occurred and that the person against whom the force was used was in fact the person who committed the felony. *Id*. Reasonableness is contingent on what an ordinarily prudent and intelligent person would do in light of his perceptions. See *People v Orlewicz*, 293 Mich App 96, 102; 809 NW2d 194 (2011). In the present case, defendant had a reasonable belief that a felony occurred. He turned the police cruiser to drive behind the Impala and saw that it had no license plate. The driver fled from defendant at a rate of speed that exceeded 100 mph. Fleeing and eluding is a felony offense, see MCL 257.620a. When

---

[9] For further support for this proposition, the prosecution also cited to caselaw involving a private citizen as the defendant seeking to invoke the fleeing-felon rule, *People v Hampton*, 194 Mich App 593; 487 NW2d 843 (1992), and a case seeking to impose civil liability for an officer's use of force, *Alexander v Riccinto*, 192 Mich App 65; 481 NW2d 6 (1991).

[10] Although the videos did not depict significant traffic at 2:00 a.m., at least five vehicles were seemingly passed during the chase.

the chase was forced to stop because of a fallen tree, the driver of the Impala disregarded defendant's commands and reversed the Impala in the direction where defendant stood rather than on the passenger side to avoid defendant. Defendant jumped into the vehicle and fired three shots at the Impala.[11] If it was unclear that the driver of the Impala engaged in felony fleeing and eluding, he used the Impala as a dangerous weapon and attempted to strike defendant. See *e.g.*, *People v Blacksmith*, 66 Mich App 216, 221; 238 NW2d 810 (1975) (A fleeing defendant, who swerved his car into a pursuing police vehicle during a high-speed chase, was properly charged with felonious assault, MCL 750.82, because an automobile can constitute a dangerous weapon). Defendant then left the police cruiser and attempted to fire shots at the Impala when it was behind the police cruiser. After correcting his weapon, defendant fired at the Impala as it was behind the police cruiser and as it drove off. The timespan between the stop at the fallen tree and the firing of the shots transpired in under 20 seconds. In light of the undisputed facts as recorded on the body camera and police cruiser video, the circuit court did not err as a matter of law in its application of the fleeing-felon rule.

We note that defendant moved for dismissal by relying on United States Supreme Court cases that address a defendant police officer's liability in the context of the fleeing-felon rule. See *Plumhoff v Rickard*, 572 US 765; 134 S Ct 2012; 188 L Ed 2d 1056 (2014); *Scott v Harris*, 550 US 372; 127 S Ct 1769; 167 L Ed 2d 686 (2007); *Tennessee v Garner*, 471 US 1; 105 S Ct 1694; 85 L Ed 2d 1 (1985). However, our Supreme Court rejected the request to apply the *Garner* decision to a case of deadly force by a private citizen and concluded that the *Garner* decision could not automatically modify Michigan criminal law with regard to fleeing felons. See *People v Couch*, 436 Mich 414; 461 NW2d 683 (1990) (Opinions by BOYLE, J. *id*. at 416, and ARCHER, J. *id*. at 426-427).[12]

Affirmed.[13]

/s/ Anica Letica
/s/ Kathleen A. Feeney

---

[11] Again, these three shots do not offend the prosecution.

[12] Although a majority of our Supreme Court agreed that *Garner* could not alter Michigan law, it is a plurality opinion because a majority declined to alter the criminal liability in relationship to the common-law fleeing-felon rule. *Couch*, 436 Mich at 417. Rather, the lead opinion noted that whether the fleeing-felon rule had outlived its utility presented a question for the Legislature. *Id*.

[13] We note that the prosecution repeatedly argued that defendant's motion was, in effect, a request to quash, and therefore, analyzed the elements of the offenses and the proofs to support those elements. Because we agree that the request for dismissal was premised on the application of a legal doctrine, see *Ali*, 328 Mich App at 542, to uncontested facts, see *Stevens (Aft Rem)*, 460 Mich at 631, we disagree. Therefore, we do not address the elements of the charged offenses as applied to the preliminary examination testimony.